## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SENSORY, INC.,<br>4701 Patrick Henry Drive, Bldg 7<br>Santa Clara, CA 95054<br><br>    Plaintiff,<br><br>v.<br><br>GOOGLE LLC<br>1600 Amphitheatre Parkway<br>Mountain View, CA 94043,<br><br>    Defendant. | Case No.  1:24-cv-2788<br><br>**DEMAND FOR JURY TRIAL** |

## <u>COMPLAINT</u>

Sensory, Inc. ("Sensory"), through its counsel, brings this action against Google LLC ("Google") for injunctive relief, treble damages, and costs of suit under the antitrust laws of the United States for violations of the Sherman Act, 15 U.S.C. §§ 1 and 2 and District of Columbia Code §§ 28-4502, 4503, and 4508.

Sensory first filed a complaint in this case on April 6, 2022.  On June 10, 2022, Sensory and Google entered a Tolling Agreement that resulted in dismissal the orginal case without prejudice to allow the then-pending Antitrust actions against Google to proceed first.  Sensory and Google then entered two extensions of their Tolling Agreement.  The Tolling Agreement expired on September 30, 2024.

Based on the public record, personal knowledge and information and belief, Sensory alleges as follows:

**INTRODUCTION**

**A.  The Public Record**

1.      Google unlawfully maintains monopolies, including monopolies in general search services and general search text advertising. Google has sought to maintain and extend these monopolies through anticompetitive conduct.

2.      This action follows years of investigation of Google's anticompetitive behavior that culminated in the filing of antitrust cases against Google by both the United States and many individual states (as well as in Europe).  These actions include:

- The October 10, 2020 action filed by the U.S. Department of Justice and 11 States ("the DOJ Action"), filed in the District of Columbia, now civil action no. 1:20-cv-03010-APM.

- The December 17, 2020 action filed in the District of Columbia by 36 States (and the District of Columbia and Territory of Guam) including the State of Colorado ("the Colorado Action"), filed as civil action no. 1:20-cd-03715-APM, but now consolidated with the DOJ Action (no. 1:20-cv-03010-APM).

- A trial is currently underway in E.D. of Virginia, in case 1:23-cv-00108.

To the extent those actions relate to anticompetitive conduct that harmed Sensory, Sensory incorporates the allegations of those complaints by reference.

3.      Discovery from Google's other cases, where relevant to this case (e.g. documents, deposition transcripts, trial transcripts, etc.) should be made available to Sensory.

4.      To the extent the action by the United States tolls any relevant statute of limitations, Sensory relies on that tolling and files this action in an abundance of caution should the limitations period relating to any of Google's actions not be tolled.

5.      After a nine week bench trial, on August 5, 2024, the Court in case no. 20-cv-3010 (APM) and Case No. 20-cv-3715 (APM) issued a Memorandum Opinion at Dkt. No. 1033 addressing the liability phase of the trial.  The Court's Memorandum Opinion is 286 pages and is attached to this Complaint as Exhibit A.

6.      The Court's conclusion was: "Google is a monopolist, and it has acted as one to maintain its monopoly. It has violated Section 2 of the Sherman Act."

7.      The Court also held that Google has monopoly power in certain markets, that "Google's distribution agreements are exclusive and have anticompetitive effects" and that "Google has not offered valid procompetitive justifications for those agreements."

8.      The Court held that Google violated Section 2 of the Sherman Act by maintaining its monopoly in two product markets in the United States— general search services and general search text advertising—through its exclusive distribution agreements.  The Court held that Google's exclusionary conduct "thwarted true competition by foreclosing rivals from the most effective channels of search distribution," thereby "deny[ing] rivals access to user queries, or scale, needed to effectively compete." *Id.* at 202, 226.

9.      The Court's Memoradum Opinion found and held:

- "For years, Google has secured default placements through distribution contracts. It has entered into such agreements with browser developers, mobile device manufacturers, and wireless carriers. These partners agree to install Google as the search engine that is delivered to the user right out of the box at key search access points." p. 2.

- "In 2009, 80% of all search queries in the United States already went through Google. That number has only grown. By 2020, it was nearly 90%, and even higher on mobile devices at almost 95%." p. 1, see also pp. 13-14.

- "Google also has a major, largely unseen advantage over its rivals: default distribution." p. 2.

- "In exchange for revenue share, Google not only receives default placement at the key search access points, but its partners also agree not to preload any other general search engine on the device. Thus, most devices in the United States come preloaded exclusively with Google." p. 3.

- "That users overwhelming use Google through preloaded search access points is explained in part by default bias, or the 'power of defaults.'" p. 26.

- "[P]lacement as the default thus drives search volume through that access point." p. 29.

- "Google recognizes that securing the default placement is extremely valuable for monetizing search queries." p. 30.

10.     The Memorandum Opinion includes findings of fact about the relevant agreements, including, for example:

> 289.  Google has entered into search distribution contracts with two major browser developers (Apple and Mozilla); all major OEMs of Android devices (Samsung, Motorola, and Sony); and the major wireless carriers (AT&T, Verizon, and T-Mobile) in the United States. In 2021, Google paid out a total of $26.3 billion in revenue share under these contracts, an expense listed in its financial statements as "traffic acquisition costs," or TAC.   UPX7002.A; Tr. at 7577:2,7577:20-24 (Raghavan) (discussing DXD21 at 2). TAC was Google's greatest expense in 2021, almost four times more than all other search-related costs combined.  *See* Tr. at 7577:2,7577:20-24 (Raghavan) (discussing DXD21 at 2); UPX7002.A.

> 348. Google has entered into Mobile Application Distribution Agreements, or MADAs, with all Android OEMs, including Motorola and Samsung, among others.

See, e.g., UPX5206 (Sony); JX49 (Motorola); JX37 (Samsung). The MADA is a device-by-device license that allows OEMs to use Google's proprietary mobile applications developed for the Android ecosystem. Tr. at 775:9-14, 781:10-11 (Kolotouros). This suite of applications is referred to as Google Mobile Services (GMS). Id. at 775:9-17 (Kolotouros). OEMs pay no fee for the GMS license, but Google requires OEMs to preload certain applications in prominent placements. See id. at 9415:16-18 *(Rosenberg).*

349.  The MADAs may be terminated only by a breach by either party. *E.g.*, JX49 at 877–78 (Google-Samsung MADA).

350.    As of 2019, about 2.3 billion Android devices were subject to the MADA. UPX129 at 904. Google employees were not aware of any non-MADA Android device sold in the United States. *See* Sept. 19, 2023 (Sealed Session) Tr. at 9:23–10:4, 12:8-10 (Yoo); Tr. at 780:23-25, 791:25–792:2 (Kolotouros).  Moreover, there are no Android OEMs that have revenue share agreements but are *not* MADA signatories. Tr. at 777:1-15 (Kolotouros); *see also id.* at 778:5-6 (Kolotouros) ("I would say to the extent the RSA generally does not happen unless an OEM has entered into a MADA, that is correct.").

351.    Google views the MADA as securing "baseline distribution of [its] apps on Android[.]"  UPX129 at 904.  Under the MADA, partner OEMs must preload all 11 GMS applications onto a new device, including the Google Search Widget, Chrome, YouTube, Gmail, Google Maps, and Google Drive, among others. *Id.* at 904–05. Six of these applications, including the Google Search application and Chrome (which both default to Google), cannot be deleted by the user. *Id.* Without a MADA, an OEM cannot distribute any one of these GMS applications. Tr. at 779:10–780:16 (Kolotouros).

11.    At trial, Google's witness Prabhakar Raghavan, Senior Vice President, Knowledge and Information Products, testified, for example: "I expect that in time, for instance, you will see these language models be able to service queries not only from typewritten prompts, but voice queries, image, camera, as well. And that's a journey that we're still early on." Memorandum Opinion pp. 40-41.

12.    Among other conclusions of law, the Court held that Google has monopoly power in the general search services market.

13.    The Court's Opinion also held that Google's contracts, including browswer agreements, MADAs, and RSAa, were exclusive.  E.g. p. 197, 204, 210, 214.

14.    The Court's Opinion also held that the exclusive agreements cause anticompetitive effects in the general search services market.  E.g. p. 214.

15.    The Court's Opinion also held that "Google's exclusive agreements have a second important anticompetitive effect: They deny rivals access to user queries, or scale, needed to effectively compete. Scale is the essential raw material for building, improving, and sustaining a GSE." E.g. p. 226.

16.    Google's anticompetitive conduct includes a number of contracts and agreements, most of which Google has marked confidential, are not in the public record, and are not yet available to Sensory.

17.    But what is already in the public record confirms Google's anticompetitive conduct.

18.    For example, Google's 2011 Mobile Application Distribution Agreement with Samsung, Section 3.4 required:

> 3.4 Placement Requirements Unless otherwise approved by Google in writing Company wilt preload all Google Applications approved In the applicable Territory or Territories on each Device Google Phone-top Search and the Android Market Client icon must be pIeced at least on the panel immediately adjacent to the Default Home Screen all other Google Applications will he placed no more than one level below the Phone Top and Google Phone Top Search must be set as the default search provider for all search access points on the Device Notwithstanding the foregoing, there are no placement requirements for Optional Google Applications.

19.    For example, Google's 2011 Mobile Application Distribution Agreement with HTC, Section 3.4 required:

> 3.4. Placement Requirements. Unless otherwise approved by Google in writing: (1) Company will preload all Google Applications approved in the applicable Territory or Territories on each Device; (2) Google Phone-top Search and the Android Market Client leon must be placed at least on the panel immediately adjacent to the Default Home Screen; (3) all other Google Applications will be placed no more than one level below the Phone Top; and (4) Google Phone-top Search must be set as the default search provider for all Web search aocess points on the Device. Notwithstanding the foregoing, there are no placement requirements for Optional

Google Applications. For clarity, "Web search" shall not include data on the Device.

20.     During Google's developer conference, Google I/O, in May 2013, the company announced that users on Google Chrome and ChromeOS would be able to have the browser initiate an audio-based search by saying "OK Google" with no button presses required. After having the answer presented, users can follow up with additional, contextual questions; an example include initially asking "OK Google, will it be sunny in Santa Cruz this weekend?" hearing a spoken answer, and reply with "how far is it from here?" An update to the Chrome browser with voice-search functionality rolled out a week later, though it required a button press on a microphone icon rather than "OK Google" voice activation. Google released a browser extension for the Chrome browser, named with a "beta" tag for unfinished development, shortly thereafter.

21.     In May 2014, the company officially added "OK Google" into the browser itself.[1]

22.     By 2014, Google required at least some phone OEMs to provide Google's hotword functionality.[2]

23.     For example, the following was reported publicly:

---

[1] *Chrome 35 launches with 'OK Google' voice search, more control over touch input, new APIs and JavaScript features*, available at https://thenextweb.com/news/chrome-35-launches-developer-control-touch-input-new-apis-javascript-features

[2] *Google's Confidential Android Reauirements Show Rising Requirements*, available at https://www.theinformation.com/articles/google-s-confidential-android-contracts-show-rising-requirements

**Google's 'Hot' Words**

For one manufacturer, the 2014 MADA agreement with Google, like the one three years earlier, says Google Search is also the default provider of all "search access points." But the new agreement expanded those points to include "assist"- and "voice search"-related actions. Assist is another word for virtual assistant like Google Now or Apple's Siri.

Another change: In the 2014 contract, Google stakes a claim to technology on phones that allows people to say words aloud that trigger an action on the device. For example, phones made by Motorola and others allow you to say "OK Google Now," followed by commands like "call cab company" or "send a message" to a friend, even if the screen is turned off.

In the new contract, Google requires partners to follow new guidelines involving "hotwords," or voice-activated triggers that cause a phone to take an action. If the Android device has such a features it "must implement" Google's hotword, should the company provide one to the manufacturer, the agreement says. It's unclear whether Google has already provided hotwords to manufacturers or whether this requirement just lays the groundwork for that. The latest version of Google's mobile search app includes the hotword functionality and is triggered when the device user says aloud, "OK Google," no matter what is on the screen.

24.    According to a June 2019 Google presentation about MADA and RSA Android Commercial Agreements, (Ex. No. UPX1077 1:20-cv-03010-APM), Google realized that others were developing their own apps and services and began responding, including with respect to the Google Assistant:



25.    The same document explained that Google's goals included to "secure more access points" including for Google Asssitant:



26.    The same Google document says that Google was protecting it Assistant to "secure

critical Assistant access points":



27.    Google discussed its plans for defaults and exclusivity for search and the Google assistant:



28.    According to a August 2019 Google presentation about MADA and RSA Android Commercial Agreements, (Ex. No. UPX0129 1:20-cv-03010-APM), Google uses the MADA to get the hotword on Android devices:



29.     According to a August 2019 Google presentation about MADA and RSA Android Commercial Agreements, (Ex. No. UPX0129 1:20-cv-03010-APM), Google uses the RSA to get the hotword "exclusivity" on Android devices:



30.     According to the same document, Google's "key goal" for RSA 3.0 is "protections for key access points" including Google's assistant:



31.   According to a 2020 Google document "Android Commercial Agreements: Exec Discussion (partial updates Oct. 2020)" Google was expanding contractual RSA coverage to secure the Google Assistant: [3]



PRIVILEGED & CONFIDENTIAL

**Why are we expanding RSA coverage and what are we changing?**
*Cover strategically important regions and Partners + Assistant distribution*

- **Expand deals to cover high-growth and strategically important regions such as Japan**
  - High growth regions (eg. BRIIM) essential to sustain future Google search growth
  - RSA affords search pre-load exclusivity and incentive for Partners to promote Google services
  - Offer incentive to Partners in iOS-strong regions such as Japan to promote Google and Android; Share loss directly increases Search and Google services distribution costs
- **Partner expansion to reflect changing ecosystem dynamics**
  - Top Chinese OEMs catching up, contributing ^Redacted^ of Android shipments and Redacted
  - Competitors aggressively targeting rising OEMs due to lack of exclusivity provisions afforded via RSA
- **Secure Assistant experience on Android; RSA affords Google-forward Assistant experience**
  - Assistive services is nascent industry with increasing competition
    - Low margin handset business incentivizes OEMs to strike distribution deals (eg. HTC's deal with Alexa, Nokia in discussions with Alexa)
    - RSA secures DHS exclusivity of OPA
  - Incentivize Security Updates and ecosystem defragmentation to provide positive user experience for Assistant
  - Increasing data needs for Assistive services requires user trust
  - Assistant experience improved via Other Google app deep-links afforded via defaults and preloads

39

32.   In the same document, Google states that the value of the MADA and RSA agreements include hotword and assistant exclusivity:

---

[3] chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.justice.gov/d9/2023-11/417644.pdf

33.     Other documents addressed similar issues, including the January 20, 2022, Report from the Commission to the Council and the European Parliament, Final report – sector inquiry into consumer Internet of Things, SWD (2022) 10 final of January 20, 2022 ("IoT Final Report") and the  Commission staff working document accompanying the document Report from the Commission to the Council and the European Parliament, Final report – sector inquiry into consumer Internet of Things, COM (2022) 19 final ("IoT Sector Inquiry").

34.     Among other findings, the Report discusses "Concerns In Relation To Pre-Installation, Default Settings And Prominence."  See, e.g. Section 8.5.  The Report noted that "a number of submissions repeating the concerns that certain (voice assistant) providers may use default settings, preinstallation or prominence to promote their own services or the services of selected third parties."  ¶ 441.

35.     The Report also discusses "8.6 Exclusivity, Tying and Concurrency Concerns."

36.     The Report states, for example:

8.9.2 Exclusivity, concurrency and tying concerns in relation to voice assistants

(494) Attempts by leading voice assistant providers to secure exclusivity of voice assistant presence on certain smart devices or, where dual assistant support is allowed, to prevent the concurrent use of the voice assistants, have been reported. Smart device manufacturers also raise concerns about voice assistant providers bundling different types of software, technology and applications, including voice assistants.

**B.  Google's Anticompetitive Behavior in Voice Assistants and Wakewords**

37.    One specific aspect of Google's anticompetitive behavior relates to its conduct relating to voice assistants, hotwords, and "wakewords" — spoken words that trigger or "wake up" a device.  Over a period of decades, Sensory developed this technology and grew a market for it.  Google, however, perceived the development and availability of wakewords and voice assistants that Google did not control as a threat to its monopolies.  Google engaged in a myriad of anticompetitive behavior that reduced consumer choices, entrenched Google's monopolies, and specifically harmed independent companies like Sensory, including through Google's agreements.

38.    Google's voice assistants and wakewords, which Google required to be set by default on devices, directed consumers to Google's search properties.  Google used its voice assistants, hotwords, and wakewords, in combination with its search engine, to extend its monopolies in general search services and general search text advertising.

39.    The was no purpose to certain of Google's contractual requirements related to voice assistants and "wakewords" other than to be anticompetitive.

40.    Google's anticompetitive practices not only hurt Sensory, but has also hurt consumers by delivering solutions of  worse quality than would be achieved if there were open competition, including Sensory. Sensory frequently outperformed Google, but customers could not use Sensory only because of Google's anticompetitive restrictions.

41.     Sensory brings this action against Google to prevent further injury to Sensory, to restore competition, to foster competition in other markets Google controls, and to receive treble damages and other relief for the harms Google has inflicted upon Sensory.  Sensory seeks this relief under Sections 1 and 2 of the Sherman Act, sections 28-4502, 4503, 4508, and 4510 of the District of Columbia Code, and under the common law, for harm resulting from Google's anticompetitive conduct in the markets described below.

## THE PARTIES

42.     Plaintiff Sensory Inc. ("Sensory") is a Silicon Valley based independent technology company and innovator in the development of wakewords and other voice recognition technology, including custom voice assistants, voice control, and sound ID technologies.

43.     Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California. Google LLC is the primary operating subsidiary of the publicly traded holding company Alphabet Inc. The managing member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California, and a wholly owned subsidiary of Alphabet Inc. Google LLC owns and operates consumer products and services such as Google Search, Android, Google Assistant, Android Automotive, Google Cloud, and Search Ads 360.

## JURISDICTION AND VENUE

44.     Sensory brings this action pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2 and pursuant to District of Columbia Code §§ 28-4502, 4503, and 4508. This Court has subject matter jurisdiction over Sherman Act claims pursuant to 28 U.S.C. §§ 1331 and 1337. This Court has subject matter jurisdiction over the District of Columbia Code claims

pursuant to 28 U.S.C. § 1367 because those claims are so related that they form part of the same case or controversy as the claims pursuant to the Sherman Act.

45.     As noted above, there are several antitrust actions pending in this jurisdiction against Google.  The allegations in this complaint overlap with certain of the allegations of at least one of the pending actions, the Colorado Action, at least to the extent that action includes allegations regarding Google's anticompetitive behavior as it relates to voice assistants.  *E.g.*, Colorado Complaint ¶¶ 127-143. To the extent jurisdiction and venue were established over Google in at least that action, jurisdiction and venue should also be established over Google in this action.

46.     Google maintains an office in this District that serves as a "regional hub for [] legal, global business, and policy teams, with a fast growing engineering presence" and is located in "the heart of downtown Washington D.C." at 25 Massachusetts Ave NW, Washington, DC 20001 (https://careers.google.com/locations/washington-dc/).

47.     Google, directly and/or through its subsidiaries and agents (including distributors, retailers, and others), conducts business (including offering products and services through its website, https://store.google.com/) in the District of Columbia, including the products and services in this action.  Some of Google's activities at issue in this complaint have taken place in this District and have affected consumers in this District.

48.     Google is subject to this Court's personal jurisdiction pursuant to due process and/or the District of Columbia's long-arm statute, D.C. Code § 13-423, due at least to its (i) transacting business in the District of Columbia, (ii) contracting to supply services in the District of Columbia, and (iii) having an interest in, using, or possessing real property in the District of Columbia.

49.     This Court has personal jurisdiction over Google, and venue is proper in this Court under 15 U.S.C. § 22 and 28 U.S.C. § 1391, because Google transacts business and is found within this District.

**BACKGROUND FACTS REGARDING SENSORY AND ITS PRODUCTS**

50.     Sensory was formed in Santa Clara, California in 1994 with the goal of making chips and technologies that allow people to communicate with products the way we communicate with each other.  To support this goal, Sensory develops and licenses technologies for speech recognition, wakewords, sound identification, natural language understanding, custom voice assistants, face and voice biometrics, and computer vision.

51.     From its creation, Sensory has focused on providing accurate speech recognition while minimizing power consumption, memory, and processing requirements of devices.  For example, Sensory introduced a new software technology based on its acquisition of Fluent Speech Technologies that came to be known as TrulyHandsfree.

52.     Sensory also achieved the goal of getting the power consumption of TrulyHandsfree lower and lower. The goal was for this technology to listen in the background for a wakeup word without false firing and without consuming too much power.  For a time, Sensory focused its entire 50-person company around this goal and achieved it.

53.     Sensory also pioneered some of the first implementations of voice assistants and neural network approaches for embedded speech recognition in consumer electronics. Sensory's technology codebase reflects the combined efforts of nearly one thousand people-years of code development.

54.     Many devices sold today rely on the use of "wakewords" to initiate verbal communication with the device. Common wakewords include phrases like "Hey Siri" for devices

17

sold by Apple, or "Ok Google" for devices using Google's technology, or "Alexa" for devices sold by Amazon.  In order for wakewords to work, the device has to be "always on" or in "listening mode" so it can listen for the wakeword and correctly determine when it has been spoken.

55.    Sensory was the first technology company to solve certain specific problems in wakewords and their deployment with voice assistants.  Efficient and effective wakewords presented technological challenges including: (1) avoiding false acceptance (waking up when no one intended the device to wake up); (2) avoiding false rejection when the consumer says the right word and the device doesn't respond; (3) addressing privacy concerns requiring the wakeword technology to run locally on device so spoken data is not constantly streamed to a cloud; and (4) keeping power consumption to a minimum to reduce battery drain for devices that are not plugged in. Sensory developed technological solutions that worked.

56.    Sensory also solved complicated technological problems related to a concept called "concurrency."  Concurrency allows more than one voice assistant to run simultaneously on a device and to be activated by distinct wakewords.  Sensory's solution allowed a small common code base to work with multiple voice assistants (instead of a separate unique wakeword codebase for each voice assistant).  This saved memory space and battery life, and Sensory's concurrent wakeword product allows multiple voice assistants to function together in a coordinated way by simultaneously listening for each assistant while avoiding redundant code and power consumption.

57.    Concurrent wakewords and voice assistants are valuable to consumers, as is consumers' ability to choose their voice assistant and their search engine.  See, *e.g., How Big*

*Tech Monopoly Made Smart Speakers Dumber*, Wash. Post (Sept. 29, 2021);[4]; *Sonos Says Google Is Blocking It from Offering More Than One Voice Assistant at Once,* The Verge (Sept. 29, 2021)[5]; *Amazon Creates a Huge Alliance to Demand Voice Assistant Compatibility But Google, Apple, and Samsung Aren't on Board*, The Verge (Sept. 24, 2019)[6].

58.    Sensory also provides a variety of other technologies useful for voice control and voice assistants, including voice command and control (TrulyHandsfree), large vocabulary recognition for domain specific assistants on device (TrulyNatural), Voice and Face biometrics which can be combined with wakewords to identify the user that wakes devices up (TrulySecure), and SoundID technology that can identify background and other noises. Sensory has sold these technologies for incorporation into mobile phones, wearables, and various "Internet of Things" ("IoT") and home appliances.

59.    Sensory's ground-breaking technology was licensed and used by major companies, including, for example, Microsoft, Apple, Amazon, Samsung, and Google itself.

60.    Sensory's technologies were incorporated into and shipped in over one billion products from hundreds of leading consumer electronics manufacturers including ATT, Hasbro, Huawei, Google, Amazon, Samsung, LG, Mattel, Motorola, Plantronics, GoPro, Sony, Tencent, Garmin, LG, Microsoft, Lenovo, and more.

61.    As a result of Sensory's technical and business success with wakewords, Sensory had a foothold on the devices and the ability to sell add-on features to customers. The ability to

---

[4] https://www.washingtonpost.com/technology/2021/09/29/smart-home-monopoly/.

[5] https://www.theverge.com/2021/9/29/22700724/sonos-smart-speakers-concurrency-google.

[6] https://www.theverge.com/2019/9/24/20881321/amazon-voice-interoperability-initiative-alexa-microsoft-baidu-intel-qualcomm-spotify-assistants.

offer additional services was important to Sensory's long-term growth and expansion. The more solutions Sensory could provide to a particular customer, the less likely that customer would try or be able to replace Sensory's suite of solutions or a portion of them.  Known as "stickiness," the more a customer would commit to Sensory's solutions, the more difficult it would be to remove Sensory technologies.

62.     Google's anticompetitive actions have crippled Sensory. Most severely, Google's actions have effectively prevented Sensory from offering wakewords on any device running Google's Android mobile operating system. While denying Sensory that foothold, Google's actions have hurt Sensory's ability to offer other solutions, such as command and control, sound ID, custom voice assistants, and other voice recognition technology.

## COUNT I:  GOOGLE'S VIOLATIONS OF 15 U.S.C. § 2.

63.     Sensory incorporates by reference the allegations set forth in the preceding paragraphs of this Complaint as though set forth again in full.

64.     As detailed above and in the public record, Google has a long and growing history anticompetitive conduct that has required the intervention of multiple regulatory bodies and courts around the world to control.  For example, as reported in *The Washington Post*, the "European Union spent a decade pursuing Google on antitrust charges, ultimately fining the company $10 billion for using illegal tactics to abuse its dominant position on the market." Jeanne Whalen, *Europe Fined Google Nearly $10 Billion for Antitrust Violations, but Little Has Changed*, Wash. Post (Nov. 10, 2020).[7] .  The $10 billion fine was in addition to a separate fine of $2.8 billion imposed by the EU in 2017:  "After a separate probe, the E.U. in 2017 fined Google $2.8 billion, concluding it had 'abused its market dominance' to give an 'illegal

---

[7] https://www.washingtonpost.com/technology/2020/11/10/eu-antitrust-probe-google/.

advantage' in its search results to Google Shopping, the horizontal bar of product ads Google features at the top of the search results screen." *Id*.

65.     The European investigations have been followed by investigations and lawsuits in the United States, many of which have focused on Google's violations of section 2 of the Sherman Act.

66.     Violation of Sherman Act § 2 has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

67.     As explained below, Google possesses monopoly power in several markets, and has acquired and maintained that power through a series of anticompetitive conduct.

I.     **Google Has Monopoly Power in Markets Including General Search Services, Search Advertising, and General Search Text Advertising**

68.     General search engines enable consumers to search the vast contents of the internet.  Google possesses monopoly power in the market for general search services.

69.     Twenty years ago, Google already claimed to be the world's largest general search engine. Its market share in general search services has grown since, from 70 percent in 2007, to over 90 percent in 2019.  *See, e.g.*, *10 Google Search Statistics*, Oberlo (Jan. 2, 2022) (reporting that Google had 92.18% of market share in July 2019).[8] No competing search engine has more than 7 percent of the market, and, over the past decade, no new entrant in the general search market in the United States has accounted for more than 1 percent of internet searches in a given year.

---

[8] https://www.oberlo.com/blog/google-search-statistics.

70.     Google's monopoly in general search has led to monopolization of the general search advertising market. The revenue Google generates from its dominance of general search advertising is astounding. Within the last decade, Google's revenue from search advertising has grown 300 percent and accounts for 61 percent of Google's total revenue. In 2019, Google made more revenue in what it characterizes as search advertising—$98 billion—than the GDP of 12 countries and the budgets of 46 States.

71.     Google effectively owns or controls search distribution channels accounting for roughly 80 percent of the general search queries in the United States. In recent years Google search has conducted nearly 90 percent of all general-search-engine queries in the United States.

## II.     Google's Maintenance and Extension of Its Monopoly Power

72.     Search access points are the places at which a consumer may enter a general search query.  At the search access point, consumers should be allowed to choose whether they use Google or another search engine for a search.

73.     In text-based searching, some search access points are the toolbar and/or URL of a web browser on a laptop or a mobile phone.  In voice-controlled search, the wakeword is the gateway to opening the search browser and, importantly, choosing which search engine to use.

74.     Google has used several mechanisms to protect and extend its dominance in general search, including: (1) securing default positions on search access points; and (2) securing exclusivity across search access points.

75.     For a search engine, the most effective means of distribution is to be the preset default general search engine for mobile and computer search access points. Even where users can change the default, they rarely do. This leaves the preset default general search engine with *de facto* exclusivity. The defaults are sticky.

76.     Google's anticompetitive conduct involves foreclosing access to search access points through contracts that require device manufacturers and others to exclude providers of technology outside of Google's control from search access points. In the case of voice-based search, Google's anticompetitive conduct includes excluding independent providers of wakewords and voice recognition like Sensory and excluding other voice assistants.

77.     On information and belief, Google has maintained an official practice for at least the last six years to hide evidence of its antitrust violations from regulators and private companies. Around 2015, Google instituted a "Communicate with Care" policy to label internal documents and communications as attorney-client privileged in an attempt to shield ordinary business communications related to its anticompetitive conduct from discovery. *See* Dkt. 326-1, Memorandum in Support of Plaintiff's Motion to Sanction Google and Compel Disclosure of Documents Unjustifiably Claimed by Google as Attorney-Client Privileged, *United States v. Google LLC*, No. 1:20-cv-03010-APM (D.D.C. Mar. 21, 2022). Google documented its "Communicate with Care" practice in training slides that instruct personnel emailing about ordinary business to copy Google's in-house counsel and to include a generic statement such as "[attorney,] please advise" on. Evidence that such 'requests' for legal advice are pretextual include: "Communicate with Care" training slides instructing Google personnel to "*any* written communication regarding Rev[enue] Share and MADA [i.e., Mobile Application Distribution Agreement] should include Legal"; tens of thousands of emails where the attorney never responds and the email chain eventually drops the attorney; and emails where non-legal Google personnel discuss a business issue, subsequently "add[] legal to make this privileged due to the sensitive nature of the data," but the attorney never responds. Google's Communicate with Care

practice harmed federal and state regulators, among others, in their lawful attempts to understand Google's anticompetitive conduct and to conduct depositions of Google's witnesses.

### A.    Google's Restrictions on Voice Assistants and Wakewords

78.    Using voice recognition software, an increasingly large number of devices can be activated or asked to perform certain tasks through spoken commands.  Devices that formerly lacked voice-based interactivity now can be asked to do things through spoken commands. These devices include such things as home speakers, televisions, cars, remote controls, refrigerators, and microwave ovens (collectively "Voice-Controlled Devices").

79.    Wakewords are commonly used to access voice-based "assistants," which are used to conduct internet searches and return information to the user.

80.    Each voice assistant typically has its own wakeword.

81.    Consumers should be allowed to choose which voice assistant they use.

82.    Consumers should be allowed to choose which search engine they use.

83.    Voice-based search has become a popular way to conduct internet searches, and the popularity of voice-based search is increasing.

84.    For example, in May 2016 Google reported that 20-25 percent of mobile queries are voice-based searches. *See, e.g.,* Greg Sterling, *Google Says 20 Percent of Mobile Queries Are Voice Searches*, Search Engine Land (May 18, 2016).[9]

85.    According to Google's Mobile Voice Study, 55% of teens use voice search on Google every day. Meg Prater, *25 Google Search Statistics to Bookmark ASAP*, HubSpot (June 9, 2021).[10]

---

[9] https://searchengineland.com/google-reveals-20-percent-queries-voice-queries-249917.

[10] https://blog.hubspot.com/marketing/google-search-statistics.

86.     If free from Google's anticompetitive conduct, voice-based searches present avenues for competition to Google's dominance in search.

87.     For example, if consumers were to begin relying on home-based smart speakers and internet-connected car platforms with voice search not controlled by Google, those devices could support and enable competition in the search-related markets by mixing and matching different (and non-Google) search engines for different purposes.

88.     To prevent the erosion or loss of its monopoly in search, Google has constructed a series of artificial barriers to protect against the use of voice assistants to access non-Google search engines.

89.     Google's actions have been directed to preventing consumers from using wakeword software to interact with other systems and search engines outside of Google's control.

90.     Google's actions have been directed to precluding consumers from using wakeword software that allows the use of concurrent wakewords to access different voice assistants and different search engines outside of Google's control.

91.     For a wakeword to function with Google's voice assistant it requires Google's permission; similarly, software that allows concurrent wakewords cannot function without Google's permission.

### 1.    Google's Restrictions on Voice Recognition and Wakewords on Mobile Devices

92.     Starting around 2011, consumers began migrating some uses from personal desktop computers to mobile devices (*e.g.*, smartphones). By 2017, most general search queries in the United States were made on mobile devices, not desktop browsers. Mobile devices offered new search access points.

93.     Search services can be delivered to mobile-device users through a variety of search access points, including voice assistants accessed by a button or voice command and designed to answer voice-initiated queries.

94.     Phones or tablets typically have search access points preset with a search engine as the default. These preset defaults are usually governed by a distribution and/or licensing agreement.

95.     Google search has preset default status for an overwhelming share of the search access points on mobile devices sold in the United States.

96.     Nearly all mobile devices with general search service capabilities in the United States run on one of two mobile operating systems: Apple iOS or Android OS.

97.      Google has made itself the default search engine on Apple products.  See, *e.g.*, Tim Hardwick, *Google Could Pay Apple $15 Billion to Maintain Default iOS Search Engine Status in 2021, Suggests Analyst*, MacRumors (Aug. 27, 2021);[11] Chance Miller, *Apple Privacy Exec Talks iOS 14 Changes and Why Google Is Still the Default Search Engine on iPhone*, 9TO5Mac (Jan. 28, 2021).[12]  For example, it appears that Google paid Apple upwards of $9 billion to remain the default search engine for Apple's Safari browser on iOS in 2018.

98.     Android OS is described as an "open source" platform developed and sponsored primarily by Google, but Google has proprietary versions of Android OS that enable mobile phones to access certain Google features and services (*e.g.,* Google Play Store, Google Maps, etc.).  Android OS is currently on over 70 percent of mobile devices and almost all of them run

---

[11] https://www.macrumors.com/2021/08/27/google-could-pay-apple-15-billion-default-search/.

[12] https://9to5mac.com/2021/01/28/apple-google-default-search-privacy/.

Google's proprietary versions. Google has used its power through Android OS to require that mobile phone manufacturers implement Google's general search engine as the default option on all major search access points, such as the browser or search widgets on the mobile device.

99.     In addition, all Google licensed Android phones come with Google Assistant built-in and set as the default voice assistant. Google requires that its wakeword technology be used to call Google Assistant.

100.     When a device uses Google Assistant, the consumer is already within Google's realm of control.  The Google Assistant uses Google for search.  Google has set restrictive policies on voice assistants and wakewords to access the Google proprietary Android OS. Google has foreclosed or limited Sensory's opportunity to provide its wakeword products, including its concurrent wakeword product, which would allow competitive voice assistants to operate on mobile phones running Google's Android OS, where the Google Assistant would be listening concurrently with another assistant.

101.     Some of Google's anti-competitive conduct relates to its distribution of Google Assistant. Google limits competition to its Google Assistant on Android devices.  On information and belief, Google has put into place a series of artificially-restrictive contracts that have guaranteed it *de facto* exclusivity in the vast majority of Android mobile channels, thus limiting the ability of consumers to reach general search competitors through other voice assistants, i.e. disallowing concurrently.

102.     On information and belief, Google also imposes contractual exclusivity on voice assistants, for example, by barring the hardware manufacturers of voice assistant devices from permitting consumers to move easily between Google Assistant and competing voice assistants, which serve as distribution channels for competing search services. As pled in the Colorado

Complaint ¶ 48, Google has even precluded the inclusion of rival personal assistant devices in any sales—even as a free addition—by a partner subject to its incentive program.

103.    On information and belief, Google's Mobile Application Distribution Agreement ("MADA") contracts began requiring mobile phone manufacturers to use Google Assistant.

104.    On information and belief, Google also modified its revenue share agreements to provide for exclusivity for Google Assistant across mobile devices. The practical effect of these agreements is to require mobile manufacturers and mobile carriers doing business with Google to shut out potential competitors to Google Assistant.

105.    In instances where Google does not own the consumer-facing voice assistant (*i.e.,* it is not Google Assistant), Google has contracted to ensure that the consumer-facing voice assistant also relies upon Google's general search services for general queries. For instance, both Apple's Siri and Samsung's Bixby use Google's search services to search the internet.

106.    Google also requires that Google Assistant and Bixby or other voice assistants cannot simultaneously function. Sensory was not only restricted in deploying a Google wakeword but could not deploy its multi-wakeword technology with the Google Assistant. Google's requirements make other voice assistants so cumbersome to use that they are effectively blocked.  For example, on some Samsung phones Bixby is called by a button press and is therefore not hands-free (https://www.samsung.com/global/galaxy/what-is/bixby-button/). Bixby invokes Google's voice assistant and search. Google has prevented simultaneous usage or simultaneous wakewords.

107.    Google has entered partnerships with manufacturers of mobile devices, home appliances (*e.g.*, smart televisions and smart speakers), and carmakers.  On information and belief, Google has required these agreements with these manufacturers to effectively exclude

wakewords outside its control (including Sensory's products and services) from a range of devices. In addition, Google has prevented multiple assistants from running concurrently on any device and from running at all on some devices, which also precludes the use of custom voice assistants.

108.    To protect and entrench its dominant position in search, Google has also imposed requirements that exclude Sensory's concurrent wakewords from a range of devices capable of running voice assistant technology.

109.    As a result of Google's foregoing activities, almost 95 percent of queries on mobile devices occur through Google search.

110.    Google's contractual restrictions effectively foreclose competing search engines from obtaining access to and distribution through 80 percent of all browsers and on virtually all mobile devices.

**2.      Google's Restrictions of Voice Assistants and Wakewords on Home Devices**

111.    Competitive voice assistants powered by general search engines other than Google could reduce Google's search monopolies through their presence on "smart" devices in the home, including smart speakers and televisions. On information and belief, Google has also entered into restrictive agreements with home device manufacturers.

112.    On information and belief, Google has denied home smart speakers the ability to incorporate multiple voice assistants with concurrency.  *See, e.g. How Big Tech Monopoly Made Smart Speakers Dumber*, Washington Post (Sept. 29, 2021); *Sonos Says Google Is Blocking It From Offering More Than One Voice Assistant At Once,* The Verge (Sept. 29, 2021);[13]  *Online*

---

[13] https://www.theverge.com/2021/9/29/22700724/sonos-smart-speakers-concurrency-google.

*Platforms and Market Power, Part 5: Competitors in the Digital Economy: Hearing before the S. Comm. on Antitrust, Commercial and Administrative Law of the H. Comm. on the Judiciary*, 116 Cong. 1 at 7-8, 12-13, 47-48, 73-74 (2020) (statement and testimony of Patrick Spence, CEO, Sonos).[14]

113.    As a further example of its anticompetitive conduct, while Google may have permitted one company (Sonos) to include a second wakeword and voice assistant in addition to "Google," on information and belief, Google's contracts impose restrictions on how the alternative wakeword/voice assistant can be invoked.  Instead of allowing concurrent listening, for example, Google requires that a wakeword/voice assistant can only be changed from "Google" when an end user opens an application associated with a Sonos speaker and manually selects the alternative wakeword/voice assistant.  In practice, consumers rarely follow the cumbersome procedure Google dictates, thereby enduring Google's default setting, and its monopolies remain in place. *See Online Platforms and Market Power*, 116 Cong. 1 at 7-8, 12-13, 47-48, 73-74.

114.    Even broad-based cooperation among technology companies has been ineffective in combating Google's anticompetitive behavior.  For example, the Voice Interoperability Initiative, which is a statement of intent from over 30 different companies (including Amazon, Microsoft, and Sensory) that they will strive to ensure devices will work with multiple digital assistants at the same time. For example, the customer could talk to either Alexa or Cortana on the same smart speaker simply by saying the appropriate wakeword. *Voice Interoperability Initiative*, Amazon, *https://developer.amazon.com/en-US/alexa/voice-interoperability* (last visited Mar. 29, 2022).  Google declined to join the Voice Interoperability Initiative.  *See, e.g.,*

---

[14] https://www.congress.gov/116/chrg/CHRG-116hhrg40788/CHRG-116hhrg40788.pdf.

*Amazon Creates a Huge Alliance to Demand Voice Assistant Compatibility but Google, Apple, and Samsung Aren't on Board*, The Verge (Sept. 24, 2019);[15] *A Year Later, Amazon's Voice Assistant Alliance Still Hasn't Attracted Any of Its Rivals,* Gadget Game News (Sept. 5, 2021).[16]

115.    By prohibiting concurrency, Google prevents consumers from using competing voice assistant services without requiring the customer to go through the cumbersome process of changing the search default on the device.

116.    On information and belief, Google requires television, speaker, and other home device makers to sign restrictive contracts, such as anti-forking agreements and other restrictive measures, that prevent competitors from reaching consumers through new channels for search distribution and deny a valuable feature—concurrency—from being deployed in the market.

117.    On information and belief, Google's agreements grant a no-cost, non-exclusive license for distributing Google Assistant on the devices and prohibit more than one voice assistant running concurrently on the device. Although the agreements permit a consumer to change the default, that requires a multistep process involving settings on a mobile app, and consumers rarely change the default once it has been set. In practice, therefore, Google has successfully limited the reach of any competing voice assistant on emerging devices.

118.    Google's concurrency prohibition hinders hardware manufacturers' ability to implement an interchangeable voice assistants, which could support access to non-Google search engines and their expansion in the market.

---

[15] https://www.theverge.com/2019/9/24/20881321/amazon-voice-interoperability-initiative-alexa-microsoft-baidu-intel-qualcomm-spotify-assistants.

[16] https://www.gadgetgamenews.com/article/amazon-voice-interoperability-initiative-alexa-apple-google-samsung.

119.   Google's prohibitions erected artificial barriers to Sensory's wakewords and voice assistants on home devices.

120.   Google's anticompetitive conduct had a direct impact on Sensory, as it effectively locked Sensory out of providing services, including wakeword-related services and custom voice assistants, to manufacturers of televisions, speakers, and other home devices.  Particularly because Sensory's solution enables concurrency, Google's behavior insured that only its assistant and not any others would be usable on the devices.

### 3.   Google's Restrictions of Voice Assistants and Wakewords in Cars

121.   The development of "connected cars" has given rise to yet another channel of distribution for search services through voice assistants and wakewords. Connected cars, like mobile devices, have an internet-enabled screen that displays applications to consumers. To avoid distracted driving, connected cars embed voice-assistant technology to allow consumers to complete tasks while maintaining their focus on the road. As a result, connected cars have emerged as another significant battleground for voice assistants and, therefore, a new channel for rival general search engines to reach consumers. Google works to foreclose search access points that could provide avenues for competitors to gain access to connected cars and the consumers in them.

122.   Google's strategy with automobiles is similar to its strategy in mobile and home devices, as described above.

123.   Google offers carmakers a free Android operating system with a bundle of Google proprietary applications, including Google Assistant, Google Play Store, and Google Maps, known as Google Automotive Services, or "GAS." Carmakers, in exchange for the operating system and Google's proprietary bundle of applications, agree to restrictive and exclusionary terms, providing Google *de facto* exclusivity for Google Assistant and therefore its general

search services within cars, further protecting Google from competition. Had Google not taken control over this interface, rival voice assistants including those from Sensory could enable the use of different underlying non-Google search engines, including relying on multiple kinds of search.

124.    Google first entered the automotive operating system market in 2017 when it officially released Android Automotive, a variation of the Android operating system for mobile devices, which integrates into vehicles. Android Automotive provides consumers an interface through a built-in screen on the dashboard to control applications (*e.g.*, music, navigation, and voice assistants) and connects smartphones and vehicle-specific features, like adjusting the air conditioning. *See, e.g.*, *Voice Assistant Tap-to-Read*, Android (Mar. 18, 2022), ("Android Automotive considers voice to be a crucial component in the enablement of drive-safe interactions and one of the safest ways for users to interact with the Android Automotive OS while driving.").[17]

125.    Google's open-source licensing of Android Automotive to carmakers and their suppliers operates in a substantially similar manner to Google's licensing of Android OS to mobile manufacturers. Google makes it a prerequisite for carmakers or their suppliers to sign an anti-forking agreement before receiving a license, which includes many of the same restrictions imposed on mobile manufacturers. Almost all carmakers have pre-existing anti-forking agreements with Google to allow consumers to connect their Android mobile phone to the car infotainment system, and these agreements bind their hands from producing an alternative Android fork for vehicle infotainment systems. The anti-forking agreements for carmakers mirror the agreements with mobile device manufacturers. For example, carmakers are prevented

---

[17] https://source.android.com/devices/automotive/voice/ttr.

from taking any action that "may cause or result" in the forking of Android, developing their own Android-based infotainment platform, or working with competing Android-based platforms, such as FireOS.

126.    Even after licensing Android Automotive operating system, carmakers lack access to Google's proprietary bundle of applications, such as Google Assistant, Maps, and Play Store. Carmakers, much like mobile manufacturers, must agree to additional contractual terms to receive access to Google's set of proprietary applications, referred to as Google Automotive Services. These terms require carmakers to preset Google Assistant as the default voice assistant.

127.    By mirroring the interlocking contractual scheme used in the mobile ecosystem, Google achieves exclusivity for its "future" of search, Google Assistant, by implementing a revenue share agreement with carmakers.

128.    Through its agreements, Google prevents car manufacturers from modifying the Android Automotive operating system to create a competing Android-based auto infotainment platform that could emerge as a competitor to Google's automotive operating system. It also bundles its applications for vehicles, limiting carmakers' options to customize the consumer experience and provide greater choice to consumers. That harms consumers directly.

129.    In a more competitive marketplace without Google's agreements, carmakers would have greater freedom to respond to consumer demand and choose the wakewords, voice assistants, and other options they want embedded into their vehicle. It would also permit more customization.

130.    Google's anti-competitive conduct had a direct impact on Sensory, as it effectively locked Sensory out of providing services, including wakeword-related services, to carmakers. Particularly because Sensory's solution enables concurrency, Google's behavior insured that only its assistant and not any others would be usable in cars.

**COUNT II: SHERMAN ACT § 1 - ILLEGAL TYING OF ANDROID OS, GOOGLE CLOUD AND OTHER GOOGLE PRODUCTS AND SERVICES TO GOOGLE ASSISTANT AND OTHER RESTRICTIONS**

131.    Sensory incorporates and restates the allegations in paragraphs 1 through 125 above.   Google's contracts and agreements with others, including hardware manufacturers, tie the availability of Android OS, the Google Cloud, revenue sharing to the use of the Google Assistant, the exclusion of or limitations on customer voice assistants, the exclusion of concurrent wakewords, and other limitations.

132.    Google has willfully and wrongfully acquired, maintained, and extended its monopoly power in internet search, text search, voice search and voice assistants through anticompetitive and exclusionary behavior.

133.    The foregoing acts and practices, and the continuing course of Google's anticompetitive conduct, have harmed consumers and competition.

134.    Google's anticompetitive and exclusionary conduct has directly and proximately caused injury to Sensory's business and property, as set forth above.

**COUNT III: VIOLATIONS OF DISTRICT OF COLUMBIA CODE §§ 28-4502, 4503, AND 4508**

135.    Sensory incorporates and restates the allegations in paragraphs 1 through 129 above.

136.    Google's conduct as alleged in this Complaint also violates District of Columbia Code §§ 28-4502 and 28-4503.

137.    District of Columbia Code § 28–4502 provides that contract, combination conspiracies in restraint of trade or commerce all are illegal.

138.    District of Columbia Code § 28–4502 provides that it is unlawful to monopolize or attempt to monopolize any part of trade or commerce.

139.    District of Columbia Code § 28–4508 allows for injunctive and compensatory relief for private parties.

140.    The foregoing acts and practices, and the continuing course of Google's anticompetitive conduct, have harmed consumers and competition.

141.    Google's anticompetitive and exclusionary conduct has directly and proximately caused injury to Sensory's business and property, as set forth above.

## REQUEST FOR RELIEF

Plaintiff respectfully requests that the Court, as authorized by statute and its own equitable powers, enter final judgment against Google and:

a. Adjudge and decree that Google acted unlawfully to maintain monopolies in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and District of Columbia Code §§ 28-4502, 4503, and 4508, in any relevant market, including general search services, search advertising, and/or general search text advertising,;

b. Enter any relief, as needed, to cure any anticompetitive harm from Google's conduct, prevent any future harm, and undo the continuing effects of past harm to competition, including those harms detailed herein;

c. Preliminarily and permanently enjoin Google from continuing to engage in the anticompetitive practices alleged herein and in similar and related conduct in the future

d. Grant such other equitable relief as the Court finds necessary to redress and prevent recurrence of Google's violations of the laws specified more fully above.

Dated: October 1, 2024

Respectfully submitted,

By: */s/ Alison Aubry Richards*

Alison Aubry Richards (Bar ID IL0109)
David P. Berten (Bar ID IL0107)
Global IP Law Group, LLC
55 W. Monroe St., Ste. 3400
Chicago, Illinois 60603
Phone: 312.241.1500
arichards@giplg.com
dberten@giplg.com

*Attorneys for Plaintiff Sensory Inc.*