**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SENSORY, INC.,<br>4701 Patrick Henry Drive, Bldg 7<br>Santa Clara, CA 95054<br><br>        Plaintiff,<br><br>v.<br><br>GOOGLE LLC<br>1600 Amphitheatre Parkway<br>Mountain View, CA 94043,<br><br>        Defendant. | Case No.  1:24-cv-2788<br><br>**DEMAND FOR JURY TRIAL**<br><br><br>**PUBLIC VERSION** |

**SENSORY'S FIRST AMENDED COMPLAINT**

| Exhibit Number | Document |
|---|---|
| A | Memorandum Opinion from DOJ/Colorado Action, case no. 1:20-cv-03010-APM (D.D.C.) (Dkt. 1033) |
| B | Public version of UPX0129 from DOJ/Colorado Action |
| C | Transcript of Dec. 1, 2023 Hearing in Epic Games, Inc. v. Google, Case No. 3:20-cv-05671-JD (N.D. Ca.) (Dkt. 591) |
| D | Findings of Fact and Conclusions of Law from Epic Games, Inc. v. Google, Case No. 3:20-cv-05671-JD (N.D. Ca.) (Dkt. 401 and Dkt. 151 from 3:22-cv-02746) |
| E | Transcript of August 24, 2024 Hearing in United States, et. al. v. Google, LLC Case No. 1:23-cv-00108-LMB-JFA (D. Va.) (Dkt. 1279) |
| F | Public version of UPX1077 from DOJ/Colorado Action |
| G | Public version of UPX0146 from DOJ/Colorado Action |
| H | Memorandum of Law in Support of Plaintiff's Motion for an Adverse Inference United States, et. al. v. Google, LLC Case No. 1:23-cv-00108-LMB-JFA (D. Va.) (Dkt. 1116) |

Sensory, Inc. ("Sensory"), through its counsel, brings this action against Google LLC ("Google") for injunctive relief, treble damages, and costs of suit under the antitrust laws of the United States for violations of the Sherman Act, 15 U.S.C. §§ 1 and 2 and District of Columbia Code §§ 28-4502, 4503, and 4508.

Sensory first filed a complaint in this case on April 6, 2022.  On June 10, 2022, Sensory and Google entered a Tolling Agreement that resulted in dismissal the original case without prejudice to allow the then-pending Antitrust actions against Google to proceed first.  Sensory and Google then entered two extensions of their Tolling Agreement.  The Tolling Agreement expired on September 30, 2024.  Sensory filed its Complaint on October 1, 2024 in accordance with the Tolling Agreement and its extensions.

## I.    THE PARTIES

1.    Plaintiff Sensory Inc. ("Sensory") is a Silicon Valley based independent technology company and innovator in the development of wake words and other voice recognition technology, including custom voice assistants, voice control, and sound ID technologies.

2.    Defendant Google LLC ("Google") is a Delaware limited liability company with its principal place of business in Mountain View, California. Google LLC is the primary operating subsidiary of the publicly traded holding company Alphabet Inc. The managing member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California, and a wholly owned subsidiary of Alphabet Inc. Google LLC owns and operates consumer products and services such as Google Search, Android, Google Assistant, Google Cloud, and Google Play store.

## II.    JURISDICTION AND VENUE

3.    Sensory brings this action pursuant to Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2 and pursuant to District of Columbia Code §§ 28-4502, 4503, and 4508. This Court has subject matter jurisdiction over Sherman Act claims pursuant to 28 U.S.C. §§ 1331 and 1337. This Court has subject matter jurisdiction over the District of Columbia Code claims pursuant to 28 U.S.C. § 1367 because those claims are so related that they form part of the same case or controversy as the claims pursuant to the Sherman Act.

4.    There are several antitrust actions pending in this jurisdiction against Google. The allegations in this complaint overlap with certain of the findings in the DOJ/Colorado Action (defined below). To the extent jurisdiction and venue were established over Google in at least that action, jurisdiction and venue should also be established over Google in this action.

5.    Google maintains an office in this District that serves as a "regional hub for [] legal, global business, and policy teams, with a fast growing engineering presence" and is located in "the heart of downtown Washington D.C." at 25 Massachusetts Ave NW, Washington, DC 20001 (https://careers.google.com/locations/washington-dc/).

6.    Google, directly and/or through its subsidiaries and agents (including distributors, retailers, and others), conducts business (including offering products and services through its website, https://store.google.com/) in the District of Columbia, including the products and services in this action.  Some of Google's activities at issue in this complaint have taken place in this District and have affected consumers in this District.

7.    Google is subject to this Court's personal jurisdiction pursuant to due process and/or the District of Columbia's long-arm statute, D.C. Code § 13-423, due at least to its (i) transacting business in the District of Columbia, (ii) contracting to supply services in the District

of Columbia, and (iii) having an interest in, using, or possessing real property in the District of Columbia.

8.     This Court has personal jurisdiction over Google, and venue is proper in this Court under 15 U.S.C. § 22 and 28 U.S.C. § 1391, because Google transacts business and is found within this District.

## III.     RELATION TO OTHER GOOGLE ANTITRUST CASES

9.     This action follows years of investigation of Google's anticompetitive behavior that culminated in the antitrust cases against Google by both the United States and many individual states, as well as multiple actions in Europe.  These actions include: The October 10, 2020 action filed by the U.S. Department of Justice and 11 States ("the DOJ Action"), filed in the District of Columbia, now civil action no. 1:20-cv-03010-APM; and the December 17, 2020 action filed in the District of Columbia by 36 States (and the District of Columbia and Territory of Guam) including the State of Colorado ("the Colorado Action"), filed as civil action no. 1:20-cd-03715-APM, but now consolidated with the DOJ Action (no. 1:20-cv-03010-APM).  This complaint refers to the two consolidated actions as the "DOJ/Colorado Action." To the extent the DOJ/Colorado Action relates to Google's anticompetitive conduct that harmed Sensory, Sensory may rely on the factual evidence and Court findings from those cases.[1]

10.     Following a nine-week bench trial, this Court issued a 286-page  Memorandum Opinion on August 5, 2024 (the "Opinion").  The Opinion is attached to this Complaint as Exhibit A, and it is incorporated by reference.

---

[1] Sensory may also rely on evidence and findings from a case filed by the DOJ in E.D. of Virginia, 1:23-cv-00108, pending before Judge Leonie Brinkema, which largely relates to advertising markets, where closing arguments were November 25, 2024.

## IV.    BACKGROUND FACTS ABOUT PLAINTIFF SENSORY AND ITS PRODUCTS

11.    Sensory was formed in Santa Clara, California in 1994 with the goal of making semiconductor chips and technologies that allow people to communicate with products the way we communicate with each other.  To support this goal, Sensory has developed technologies for wake words, voice recognition, sound identification, natural language understanding, custom voice assistants, face and voice biometrics, and more.

12.    From its creation, Sensory has focused on providing accurate speech recognition while minimizing power consumption, memory, and processing requirements of devices.  For example, Sensory introduced a new software technology based on its acquisition of Fluent Speech Technologies that came to be known as TrulyHandsfree.

13.    Sensory also achieved the goal of getting the power consumption of TrulyHandsfree lower and lower. The goal was for this technology to listen in the background for a wakeup word without false firing and without any misses yet not consuming too much power.  For a time, Sensory focused the technical resources of the company around this goal and achieved it.

14.    Sensory also pioneered some of the early implementations of voice assistants and neural network approaches for embedded speech recognition in consumer electronics. Sensory's technology codebase reflects the combined efforts of hundreds of people-years of code development.

15.    Many devices sold today rely on the use of "wake words" to initiate verbal communication with the device. Common wake words include "Hey Siri" for devices sold by Apple, or "OK Google" for certain devices using Google's Android operating system, or "Alexa" for devices sold by Amazon.  In order for wake words to work, the device has to be "always on"

4

or in "listening mode" so it can listen for the wake word and correctly determine when it has been spoken.

16.     Sensory was the first technology company to solve certain specific problems in wake words and their deployment with voice assistants.  Efficient and effective wake words presented technological challenges including: (1) avoiding false acceptance (waking up when no one intended the device to wake up); (2) avoiding false rejection when the consumer says the right word and the device doesn't respond; (3) addressing privacy concerns requiring the wake word technology to run locally on device so spoken data is not constantly streamed to a cloud; and (4) keeping power consumption to a minimum to reduce battery drain for devices that are not plugged in. Sensory developed technological solutions that worked.

17.     Sensory also solved complicated technological problems related to a concept called "concurrency."  Concurrency allows more than one voice assistant to run simultaneously on a device and to be activated by distinct wake words.  Sensory's solution allowed a small common code base to work with multiple voice assistants (instead of a separate unique wake word codebase for each voice assistant).  This saved memory space and battery life, and Sensory's concurrent wake word product allows multiple voice assistants to function together in a coordinated way by simultaneously listening for each assistant while avoiding redundant code and power consumption.

18.     Concurrent wake words and voice assistants are valuable to consumers, as is consumers' ability to choose their voice assistant or their search engine.  See, *e.g., How Big Tech Monopoly Made Smart Speakers Dumber*, Wash. Post (Sept. 29, 2021);[2] *Sonos Says Google Is*

---

[2] https://www.washingtonpost.com/technology/2021/09/29/smart-home-monopoly/.

*Blocking It from Offering More Than One Voice Assistant at Once,* The Verge (Sept. 29, 2021);[3]

*Amazon Creates a Huge Alliance to Demand Voice Assistant Compatibility But Google, Apple, and Samsung Aren't on Board*, The Verge (Sept. 24, 2019).[4]

19.    Sensory's ground-breaking wake word technology was licensed and used by major companies, including, for example, Microsoft, Apple, Amazon, Samsung, and Google itself.

20.    Sensory's technologies were incorporated into and shipped in over one billion products from hundreds of leading consumer electronics manufacturers including ATT, Hasbro, Huawei, Google, Amazon, Samsung, LG, Mattel, Motorola, Plantronics, GoPro, Sony, Tencent, Garmin, LG, Microsoft, Lenovo, and more.

21.    Sensory's wake words have been the front end of many search engines including Google, Cortana, Siri, and Alexa.

## V.    Sensory's Success In the Wake Word Market for Smartphones and the Market for Voice Recognition Software Before Google's Anticompetitive Conduct

22.    After developing wake word technologies that operated at relatively low power levels, Sensory built a successful business licensing its technologies to companies, including a significant number of companies selling smartphones and tablets.

23.    Many of the smartphones and tablets that used Sensory's wake word technology used the Android operating system supplied by Google.

24.    Today, Sensory's software products fall mainly into three different product lines: (1) TrulyHandsfree, which covers wake words and commands using keyword spotting (Sensory's "TrulyHandsfree Product" or "THF Product"); (2)  TrulyNatural, which supports

---

[3] https://www.theverge.com/2021/9/29/22700724/sonos-smart-speakers-concurrency-google.

[4] https://www.theverge.com/2019/9/24/20881321/amazon-voice-interoperability-initiative-alexa-microsoft-baidu-intel-qualcomm-spotify-assistants.

larger vocabularies using grammars, speech to text, acoustic models and language models (Sensory's "TrulyNatural Product."); and (3) TrulySecure, which permits speaker verification, Face ID, and sound ID (Sensory's "TrulySecure Product.").

25.    For certain customers, Sensory's TrulyHandsfree Product on its own acts a voice assistant, because it can both activate a device when it detects that the appropriate wake word has been spoken, and it can follow up device activation with an action, such as "call," "take a photo" "take a video" or a similar command.

26.    For other customers, adding Sensory's TrulyNatural Product enhances the voice assistant capabilities of a device.

27.    Sensory built a successful business licensing its TrulyHandsfree Product and TrulyNatural Product, and TrulySecure Product to companies, particularly companies building smartphones and tablets running Google's Android operating system.

28.    During the six-year time frame ending in from October 2012 to September 2018, for example, Sensory generated ███████████ in revenue from companies that used Google's Android operating system and Sensory's TrulyHandsfree Product in smartphones and tablets.

29.    In each its fiscal years 2017 and 2018, Sensory generated in the excess of ███ ███████ each year in revenue from companies that used Sensory's TrulyHandsfree Product in smartphones and tablets running Google's Android operating system.

## VI.    Google Enters the Wake Word and Voice Assistant Market in Competition with Sensory and Uses its MADA and RSA Contracts to Eliminate Sensory from the Market and Secure Exclusive Use of Google's Assistant and Hotwords

30.    In 2012, Google did not have its own wake word or voice assistant technology. When it wanted to add wake words and spoken commands to a new product it was developing, Google Glass, Google licensed Sensory's TrulyHandsfree Product for use of specific wake

words and commands for use in Google' Google Glass device.  The agreement with Google calls the wake words and commands Google licensed "hotwords."

31.    The 2012 Google-Sensory agreement was approved at the highest levels within Google.  On behalf of Google, the agreement was signed by Sergey Brin, one of the co-founders of Google.

32.    Google was so impressed with Sensory's technology that Google and Sensory entered negotiations for Google to acquire Sensory.  After doing substantial due diligence on Sensory's technology, Google ultimately decided to not acquire Sensory.

33.    Subsequent to its exposure to Sensory's TrulyHandsfree Product, Google developed its own hotword/wake word technology and began competing with Sensory in the market for wake words for use on smartphones and tablets using the Google-supplied Android operating system.

34.    Once Google developed its own wake word technology, Sensory and Google were competitors in the market to supply wake word technology to smartphone and tablet manufactures that used the Google-supplied Android operating system.

35.     Subsequent to its exposure to Sensory's TrulyHandsfree Product, Google also developed its own voice assistant technology and began competing with Sensory in the market for voice assistants for use on smartphones and tablets using the Google-supplied Android operating system.

36.    Once Google developed its own voice assistant technology, Sensory and Google were competitors in the market to supply voice assistant technology to Android smartphone and tablet manufactures.

37.    Once Google had developed its own wake word and voice assistant technology, it

began to distribute the technologies to virtually every smartphone and tablet sold in the United States that is not made by Apple through modifications to its Mobile Device Distribution Agreement (MADA). These modifications included: (1) requiring the use of Google hotwords and the Google Assistant and (2) in many cases to require that the use of Google hotwords and the Google Assistant be exclusive.

38.     "As of 2019, about 2.3 billion Android devices were subject to the MADA. UPX129 at 904. Google employees were not aware of any non-MADA Android device sold in the United States. *See* Sept. 19, 2023 (Sealed Session)." Ex. A, ¶ 350.

39.     Google's modifications of its agreements to require the use of its hotwords and Google Assistant (and in many cases to make their use exclusive) is confirmed in many of Google's documents that have become partially public as a result of the DOJ/Colorado Action.

40.     One Google document dated August 2019, UPX0129, describes Google's "Core Commercial Agreements" for Android as its Mobile Device Distribution Agreement (MADA) and Search Revenue Share Agreement (RSA).  A copy of the redacted and abridged version of UPX0129 that is publicly available from the Justice Department is attached as Exhibit B and incorporated by reference.

41.     UPX0129 is labelled "Attorney-client privileged," but was nonetheless produced in the litigation and is included within the DOJ's Trial Exhibits.  This means either that Google waived the attorney-client privilege with respect to the subject matter of the communications contained in the document or Google's privilege designation was recognized as improper to begin with and later withdrawn by Google. *See, e.g.* N.D. of California case 3:20-cv-05671-JD, Dkt. No. 591 (Exhibit C) (Judge Donato's statements about Google's "faux privileged materials" and "As a result, Google's outside counsel in this case initially withheld tens of thousands

records on the grounds of privilege, which ultimately were re-reviewed, deemed not privileged, and produced to Plaintiffs."); D. D.C. case no. 1:20-cv-03010-APM, Dkt. No. 1033 (Exhibit A) (Judge Mehta's statements about Google's "bogus privilege assertions" and "disturbing testimony about the use of quote, 'fake privilege,' close quote" and "These documents, which I have looked at quite closely in the course of their presentation in evidence, these documents on their face have typically not included any indicia that the document was, in fact, prepared in connection with an attorney-client communication or with the goal of it soliciting attorney advice."); E. D. Va. case no. 1:23-cv-00108-LMB-JFA, Dkt. No. 1279 (Exhibit E) (Judge Brinkema's statements:  "I certainly do not mind saying right now from the bench that the policy – the Communicate-with-Care policy, in my mind, is not the way in which a responsible corporate entity should function. Slapping on the -- you know, attorney on email -- in many cases routine email messages just to be able to throw up a smoke screen of, you know, attorney-client privilege is, in my view, a clear abuse of the privilege….. this approach, putting the attorney communication business on almost all communications that are at all sensitive is absolutely inappropriate and improper, and I would draw inferences from that….. I've heard it, I don't like what I've heard.")

42.    In UPX129, Google states that the MADA "Secures baseline distribution of our apps on Android," and that the RSA "Reinforces MADA's distribution ***with additional protections for our revenue generating services***." Ex. B. at 903 (emphasis added).[5]

43.    In UPX129, Google states that through its then-new MADA "we get" "Search widget + Assistant gestures & hotword."  Ex. B. at 904.

---

[5] Following the citation format used in the Opinion, the page number refers to the last three digits of the Bates-number at the bottom of the exhibit.

44.    In UPX129, Google states that pursuant to the Search Revenue Share Agreement (the "RSA"), Google "get[s]" "Out-of-box Assistant gesture, ***hotword***, and homescreen ***exclusivity***." Ex. B. at 906 (emphasis added).

45.    In UPX129, Google states one of the "key goals" in the evolution of Google's RSA (from the 2016 version of RSA 2.0 to the 2019 version called RSA 3.0) was to secure "Platform-wide ***protections*** for ***key access points*** not covered by MADA (browsers and assistant)." Ex. B at 907 (emphasis added).

46.    Another Google document made partially public in the DOJ/Colorado Action is Exhibit UPX01077, a June 2019 Google presentation "Google Distribution on Android Framework." A copy of UPX1077 is attached as Exhibit F to this complaint and incorporated by reference.

47.    Like exhibit UPX129, exhibit UPX1077 is also labelled "Privileged & Confidential," and the cover page states: "Privileged and Confidential – Reflects Advice of External EU Counsel." Like UPX129, UPX1077 was also nonetheless produced in the litigation and is included within the DOJ's Trial Exhibits. This means either that Google waived the attorney-client privilege with respect to the subject matter of the communications contained in the document or the designation was recognized as improper to begin with and later withdrawn by Google. See judicial statements regarding Google's improper use of privilege designations discussed in paragraph 41 above.

48.    In UPX1077, Google states that the development other access points, apps, and services was creating "higher exposure" to Google's search-based revenue. Ex. F at 302-001.

49.    In UPX1077, Google states that it introduced a "new platform tier of RSA to secure browser defaults and assistant DHS exclusivity & gesture at scale." Ex. F at 302-001.

50.     In UPX1077, Google states that one thing it "Gets" from Google's efforts included "Set additional access points" and to "Account for Assistant Considerations" because "Assistants increasingly seen as a future platform." Ex. F at 302-003.

51.     In UPX1077, Google states that it was protecting its Assistant to "secure critical Assistant access points." Ex. F at 302-009.

52.     In UPX1077, Google states that the RSA achieves "exclusivity for Search and Assistant." Ex. F at 302-039.

53.     Another document made partially public in the DOJ/Colorado Action was Trial Exhibit UPX0146, a 2020 Google document "Android Commercial Agreements: Exec Discussion (partial updates Oct. 2020)." A copy of UPX146 is attached as Exhibit G to this complaint and incorporated by reference.  Google has heavily redacted the version available to the public.

54.     Like exhibits UPX129 and UPX1077, Exhibit UPX0146 is also labelled "Confidential + Proprietary" and the cover page states: "PRIVILEGED AND CONFIDENTIAL" Like UPX129 and UPX1077, UPX146 was also nonetheless produced in the litigation and is included within the DOJ's Trial Exhibits.  This means either that Google waived the attorney-client privilege with respect to the subject matter of the communications contained in the document or the designation was recognized as improper to begin with and later withdrawn by Google. See judicial statements regarding Google's improper use of privilege designations discussed in paragraph 41 above.

55.     In UPX146, Google states "MADA + RSA Economics: Revenue at risk" (the rest of the slide is redacted). Ex. G at 412.

56.     In UPX146, Google states "New RSA template rollout with Assistant and

Android update requirements" in 2017 was designed to expand "Assistant distribution." Ex. G at 419.

57.     In UPX146, Google states that a "priority" in 2017 was "Assistant + Android Health." The "new template for revenue share developed to reflect current priorities: 1) Assistant distribution w/ DHS exclusivity." Ex. G at 420.

58.     In UPX146, Google states the RSA program was expanded from 16 OEMs in 2016 to 51 OEM and carrier partners in 2017. Ex. G at 420.

59.     In UPX146, Google states that it removed a previous requirement in the MADA that "search intent set to Google" to "reduce pressure." At the same time, Google added provisions to the MADA that "Assist intent defaults to Google" and "Google hotword enabled & Google has access to DSP." Ex. G at 421.

60.     In UPX146, Google states that in addition to the changes in the MADA, Google added Assistant-based provisions to the RSA, including "Restrictions for DHS placement and OOB enablement of 3P & carrier assistants." Ex. G at 421.

61.      In English, the last point translates to the following:  Google's revenue share agreement included restrictions preventing alternative assistant from being place on the home screen of a device and required that assistants provided from third parties (like Sensory) and carriers could not be enabled "out of the box"; the RSA effectively imposed cumbersome activation steps for the use of non-Google assistants.

62.     In another document discussed by the Court, Google's agreements expressly define use of a voice-based user input seeking information as a "Search Query."  As explained by the Court, for example, Google entered an Internet Services Agreement (ISA) with Apple, and "Search Query" under the ISA is defined as any user input seeking information that is

entered on ***Apple's voice assistant, Siri***; its on-device search, Spotlight; or Safari." Ex. A at 102, ¶ 295 (emphasis added).

63.     As demonstrated by its agreement with Apple, Google understood that voice assistants like Apple's Siri (or Google's own voice assistant, Assistant (invoked by saying the hotword "OK Google" or something similar)) were access points to Google's general search engine.

64.     With regard to the market for voice assistants, Google recognized that such assistants were being used to conduct internet searches in a manner similar to the way a user would conduct a search by typing text into a search bar.

65.     From a technical perspective, the manner in which a voice assistant is used to conduct a search is to first convert the spoken speech into text and enter the transcribed text into a search engine. From the perspective of the search engine, the system runs the same whether the search query is typed or spoken.

66.     Because voice assistants are an access point to a general search engine, Google sought to control how and which voice assistants could be invoked for the same reasons it sought to control distribution of other access points such as default browsers and default search engines: Google wanted to protect and extend its monopoly in general search engines by cutting off access to alternative services.

67.     With regard to smartphones and tablets running the Apple iOS operating system, which use Apple's Siri as the voice assistant, Google entered anticompetitive agreements (at least including the Internet Services Agreement) with Apple under which Google paid Apple to direct Siri-initiated search queries to Google's search engine.

68.     With regard to smartphones and tablets running Google's Android operating

system, Google at first faced competition in the wake word and voice assistant markets for those devices.  Device manufacturers, for instance, could use Sensory's wake word and voice assistant technology to initiate search queries on a competing search engine.

69.    To eliminate competition and protect and extend its monopoly in general search engines, Google entered anticompetitive agreements (at least including MADA and RSA agreements) with device manufactures to (1) require the distribution of Google own Assistant; and (2) in many case, make the use of Google Assistant exclusive on the device.

70.    Sensory alleges the same allegation made in the Colorado Action: "In instances where Google does not own the consumer-facing voice assistant, it has contracted to ensure that the consumer-facing voice assistant relies upon Google's general search services for general queries. For instance, both Apple's Siri and Samsung's Bixby use Google's general search services to search the internet." Colorado Action Complaint, ¶ 129.

71.    Sensory alleges the same allegation made in the Colorado Action: "Voice assistants on mobile devices. Starting as early as 2017, Google's MADA contracts began requiring mobile phone manufacturers to set "Google as the default Assist App" and obliged mobile manufactures to make "Home" buttons on devices point to Google Assistant. Google also modified its revenue share agreements to provide for exclusivity for Google Assistant across mobile devices. The practical effect of these agreements is to require mobile manufacturers and mobile carriers doing business with Android to shut out potential competitors to Google Assistant, just like Google used Android to prevent other general search engines from obtaining a foothold in the mobile search market." Colorado Action Complaint, ¶ 131.

72.    In many cases, Google's MADA and RSA agreements prevent device manufacturers from using non-Google wake words and voice assistants.

73.     In many cases, Google's MADA and RSA agreements prevent device manufacturers from using technology that would allow wake word/voice assistant concurrency, meaning that the device could listen for multiple wake words at the same time.

## VII.    Google Succeeds In Eliminating its Competitor, Sensory, from the Market

74.     As noted above, in the two fiscal years ending in September 2017 and September 2018, Sensory generated over ███████ each year from the licensing of its TrulyHandsfree Product to companies that used Google's Android operating system in smartphones and tablets.

75.     Based on documents made partially public in the DOJ/Colorado Action, in the 2019 time frame Google changed its MADA and RSA agreements to require use of Google's hotwords and the Google Assistant, and in many cases made the use exclusive to Google.

76.     In its fiscal year ending in September 2019, as Google's MADA and RSA agreements required the use of Google's hotwords and Assistant, Sensory's revenue from companies that used Google's Android operating system and Sensory's TrulyHandsfree Product in smartphones and tablets dropped by over 75% from the previous year, to a total of less than ██ ████

77.     In its fiscal year ending in September 2020, as Google's MADA and RSA agreements required the use of Google's hotwords and Assistant from even more companies, Sensory's revenue from companies that used Google's Android operating system and TrulyHandsfree Product in smartphones and tablets dropped by over another 80% from the previous year, to a total in the ██████████████████

78.     In its fiscal year ending in September 2021, as Google's MADA and RSA agreements required the use of Google's hotwords and Assistant "got" Google what it wanted, Sensory's revenue from companies that used Google's Android operating system and

TrulyHandsfree Product in smartphones and tablets was effectively eliminated from the previous year, to a total of less than ███.

79.     In its fiscal year ending in September 2022, Sensory's revenue from companies that used Google's Android operating system and TrulyHandsfree Product in smartphones and tablets disappeared completely.

## VIII.    Governments File the DOJ/Colorado Action and the Court Determines Google Is a Monopolist that Protected and Expanded its Monopolies through its MADA and RSA Agreements.

80.     As noted above, the DOJ Action and the Colorado Action were filed in 2020.  After a nine week bench trial focused on Google's distribution agreements, the Court in the consolidated DOJ/Colorado Action issued a Memorandum Opinion at Dkt. No. 1033 addressing the liability phase of the trial.  Exhibit A.

81.     Much of the DOJ Action focused on Google's dominance in what the Court called the "general search engine" or GSE market, and how Google protected and extended its monopoly in that market through it distribution agreements.  In particular, the Court's Opinion explains how Google's distribution agreements both (1) require use of, and prominent placement of, Google products (including Google's search engine) and (2) prevent device manufacturers from preloading non-Google products (such as competitor search engines) on the device.

82.     Through its agreements, Google seeks to control, and does control, "access points" to general search queries.  One such access point is a voice-activated wake word in general, and a wake word that results in the invocation of the "Google Assistant" to use Google to conduct a search in particular.  Another related access point is the  voice recognition software (speech to text) used for search.

83.     The Opinion sets forth as having been proven many facts relevant to this action,

and Sensory alleges that the Court's conclusions in paragraphs 83 to 98 are correct.

84.    Under the principles of res judicata and collateral estoppel, Google is estopped from contesting the conclusions of law and fact set forth in paragraphs 83 to 98.

85.    Google is a monopolist, and it has acted as one to maintain its monopoly. It has violated Section 2 of the Sherman Act.  *See* Ex. A at 4.

86.    There are relevant product markets for general search services and general search text ads; Google has monopoly power in those markets; Google's distribution agreements are exclusive and have anticompetitive effects; and Google has not offered valid procompetitive justifications for those agreements. *See* Ex. A at 4

87.    Google has exercised its monopoly power by charging supracompetitive prices for general search text ads. That conduct has allowed Google to earn monopoly profits. *See* Ex. A at 4.

88.    In exchange for revenue share, Google not only receives default placement at the key search access points, buts its partners agree not to preload any other general search engine on the device. Thus, most devices in the United States come preloaded exclusively with Google. *See* Ex. A at 3.

89.     In 2009, 80% of all search queries in the United States already went through Google. That number has only grown. By 2020, it was nearly 90%, and even higher on mobile devices at almost 95%. *See* Ex. A at 1, see also pp. 13-14.

90.    Google's exclusionary conduct thwarted true competition by foreclosing rivals from the most effective channels of search distribution, thereby denying rivals access to user queries, or scale, needed to effectively compete. *See* Ex. A at 202, 226.

91.    For years, Google has secured default placements through distribution contracts.

It has entered into such agreements with browser developers, mobile device manufacturers, and wireless carriers. These partners agree to install Google as the search engine that is delivered to the user right out of the box at key search access points. *See* Ex. A at  2.

92.     Google has entered into search distribution contracts with two major browser developers (Apple and Mozilla); all major OEMs of Android devices (Samsung, Motorola, and Sony); and the major wireless carriers (AT&T, Verizon, and T-Mobile) in the United States. In 2021, Google paid out a total of $26.3 billion in revenue share under these contracts, an expense listed in its financial statements as "traffic acquisition costs," or TAC.  UPX7002.A; Tr. at 7577:2,7577:20-24 (Raghavan) (discussing DXD21 at 2). TAC was Google's greatest expense in 2021, almost four times more than all other search-related costs combined.  *See* Tr. at 7577:2,7577:20-24 (Raghavan) (discussing DXD21 at 2); UPX7002.A.  *See* Ex. A at ¶ 289.

93.     Google has entered into Mobile Application Distribution Agreements, or MADAs, with all Android OEMs, including Motorola and Samsung, among others. See, e.g., UPX5206 (Sony); JX49 (Motorola); JX37 (Samsung). The MADA is a device-by-device license that allows OEMs to use Google's proprietary mobile applications developed for the Android ecosystem. Tr. at 775:9-14, 781:10-11 (Kolotouros). This suite of applications is referred to as Google Mobile Services (GMS). Id. at 775:9-17 (Kolotouros). OEMs pay no fee for the GMS license, but Google requires OEMs to preload certain applications in prominent placements. See id. at 9415:16-18 *(Rosenberg). See* Ex. A at ¶348.

94.     The MADAs may be terminated only by a breach by either party. *E.g.*, JX49 at 877–78 (Google-Samsung MADA). *See* Ex. A at ¶ 349.

95.     As of 2019, about 2.3 billion Android devices were subject to the MADA. UPX129 at 904. Google employees were not aware of any non-MADA Android device sold in

the United States. *See* Sept. 19, 2023 (Sealed Session) Tr. at 9:23–10:4, 12:8-10 (Yoo); Tr. at

780:23-25, 791:25–792:2 (Kolotouros).  Moreover, there are no Android OEMs that have

revenue share agreements but are *not* MADA signatories. Tr. at 777:1-15 (Kolotouros); *see also*

*id.* at 778:5-6 (Kolotouros) ("I would say to the extent the RSA generally does not happen unless

an OEM has entered into a MADA, that is correct."). *See* Ex. A at ¶ 350.

96.     Google views the MADA as securing "baseline distribution of [its] apps on

Android[.]"  UPX129 at 904.  Under the MADA, partner OEMs must preload all 11 GMS

applications onto a new device, including the Google Search Widget, Chrome, YouTube, Gmail,

Google Maps, and Google Drive, among others. Id. at 904–05. Six of these applications,

including the Google Search application and Chrome (which both default to Google), cannot be

deleted by the user. Id. Without a MADA, an OEM cannot distribute any one of these GMS

applications. Tr. at 779:10–780:16 (Kolotouros).  *See* Ex. A at ¶ 351.

97.     Google's contracts, including browser agreements, MADAs, and RSAs, were

exclusive (e.g. p. 197, 204, 210, 214), and that such exclusive agreements cause anticompetitive

effects in the general search services market.  *See* Ex. A p. 214.

98.      Google's exclusive agreements have a second important anticompetitive effect:

They deny rivals access to user queries, or scale, needed to effectively compete. Scale is the

essential raw material for building, improving, and sustaining a GSE. *See* Ex. A p. 226.

99.     The same restrictions in Google's contracts, including its MADAs and RSAs,

which concerned the Court with Google's efforts to protect to its monopoly in general text

search, apply to  Google's voice-based search with equal force.

100.     The Court's grant of summary judgment on the claim related to Google's Google

Assistant agreements has no preclusive or other effect on Sensory here.   In that case, Google

requested summary judgment on its claims related to the Google Assistant agreements.   The

government's opposition did not respond to Google's argument. With no substantive response

from Plaintiffs, the court granted summary judgment in favor of Google "to the extent Plaintiffs'

claims rest on conduct relating to Google Assistant." That the government plaintiff focused that

case, and may have run out of time, money, or resources to pursue **all** of Google's

anticompetitive conduct in that one case, is of no consequence here.

## IX.    Google's Efforts to Conceal Its Anticompetitive Conduct

101.    Google has "created a rampant and systemic culture of evidence suppression,"

which includes at least two components relevant here: (1) the failure to properly preserve

documents (including chat messages); and (2) the use of "fake privilege" assertions to screen

non-privileged material from production.

102.    Google, from the highest levels of its organization, trained its employees to

channel discussion of hot topics that may be used against Google to Google's internal instant-

message chat tools.

103.    Specifically with regard to Google's anticompetitive RSAs and MADAs, Google

trained its employees to add its in-house lawyers on "*any* written communication regarding Rev

Share [RSA] and MADA." Exhibit A at 78 (quoting UPX320 at 605).

104.    As is evident from the review of exhibits UPX129, UPX1077, and UPX146,

Google followed the policy outlined in the preceding paragraph, as those documents are labelled

"Privileged and Confidential" or similar wording.

105.    In 2008, Google's then General Counsel, Kent Walker, sent a memo that reflected

that Google had modified the default setting for all employee chats on Google's internal chat

platform from "history on" to "history off." Internally dubbed "Vegas mode," this change

resulted in Google automatically deleting chat messages with "history off" after 24 hours.

106.    The Walker Memo is available at https://www.benedelman.org/walker-2008-memo/.

107.    Google instituted a policy that, absent manual intervention by business employees on a chat-by-chat basis, all internal chat communications would be automatically destroyed after 24 hours.  See, e.g. E.D. of Va. case 1:23-cv-00108-LMB-JFA, Dkt. 1116 (Exhibit H), Memorandum of Law in Support of Plaintiffs' Motion for an Adverse Inference.

108.    Even for those Google employees who managed to overcome the auto-delete default, their chats were nevertheless deleted because they were not timely placed on litigation holds so even "history on" chats were not preserved under Google's normal document retention polices.

109.    Google maintained its auto-deletion policy for instant message chats until at least February 8, 2023.

110.    Google persisted with the history-off default and resulting auto-deletion for all chats and all employees, including those under legal hold, until at least February 8, 2023.

111.    "It was not until Plaintiffs moved for sanctions in February 2023, more than two years after filing suit, that Google changed its policy to automatically save all chats of employees under a legal hold."  Exhibit A p. 273.

112.    Not only did Google choose to continue its policy of autodeletion of chats after 24 hours, Google also chose to delay placing many of its employees on a litigation hold until months (or even years) after Google was required to preserve their documents.

113.    Plaintiff's Memorandum of Law (Exhibit H to this FAC) cited an Appendix A, which was filed under seal and unavailable to the public or Sensory. Appendix A stated when

Google reported that certain witnesses were sent a litigation hold notice.

114.    The Memorandum of Law (Exhibit H) also cited an Appendix D, a timeline of events related to spoliation, which was also filed under seal and unavailable to the public or Sensory.

115.    The DOJ and Colorado filed their actions in 2020.

116.    Sensory first filed a complaint against Google on April 6, 2022. See D.D.C. case no. 1:22-cv-00937-APM.

117.    Google did not properly preserve, and instead deleted, chats relevant to this case until at least a year after this case was first filed and three years after the DOJ Action and Colorado Action were filed (e.g. February 2023).

118.    Sensory filed its Complaint in this case on October 1, 2024 in accordance with the Tolling Agreement and its extensions.

119.    Google was required to preserve relevant documents after the DOJ and Colorado Actions were filed in 2020 and after Sensory filed its first complaint against Google in April 2022.

120.    By April 2022, Google was not only aware of the existence of this potential civil action, it was aware that Sensory had actually filed a civil antitrust action against Google, D.D.C. case no. 1:22-cv-00937-APM.

121.    At the latest, by the time Sensory filed its case in April 2022, Google had a legal duty to preserve evidence relevant to this action.

122.    Google also already had a legal duty to preserve much of the same evidence for other ongoing antitrust actions.

123.    On information and belief, Google did not issue a litigation hold for documents

relevant to the issues in this case in 2022.

124.    On information and belief, Google did not issue a litigation hold for documents

specific to this Sensory case in 2022.

125.    Google's failure to preserve documents results in an inference that the documents

contain information that undermines Google's defense of this action.

**Judge Donato's Findings and Rulings in 2023**

126.    On March 28, 2023, Judge Donato issued an Order in N.D. of California case

3:20-cv-05671-JD, Dkt. 401, attached as Exhibit D.  In that Order, Judge Donato held, on the

issue of spoliation:

> What matters is how Google responded after the lawsuits were filed, and ***whether it honored the evidence preservation duties it was abundantly familiar with from countless prior cases***. The record establishes that Google ***fell strikingly short on that score***. Several aspects of Google's conduct are troubling. As Rule 37 indicates, the duty to preserve relevant evidence is an unqualified obligation in all cases…..
>
> ***Google clearly had different intentions with respect to Chat, but it did not reveal those intentions with candor or directness to the Court or counsel for plaintiffs***. Instead, ***Google falsely assured the Court*** in a case management statement in October 2020 that it had "taken appropriate steps to preserve all evidence relevant to the issues reasonably evident in this action," without saying a word about Chats or its decision not to pause the 24-hour default deletion. Case No. 20-5761, Dkt. No. 45 at 11. Google did not reveal the Chat practices to plaintiffs until October 2021, many months after plaintiffs first asked about them. See Dkt. No. 429 (Google's response to Court's questions) at 3 ("Google informed Plaintiffs on October 21, 2021, that it had not suspended the 24-hour retention policy for history 'off' chats."). The Court has since had to spend a substantial amount of resources to get to the truth of the matter, including several hearings, a two-day evidentiary proceeding, and countless hours reviewing voluminous briefs. All the while, ***Google has tried to downplay the problem and displayed a dismissive attitude ill tuned to the gravity of its conduct***. Its initial defense was that it had no "ability to change default settings for individual custodians with respect to the chat history setting," Dkt. No. 427-3 ¶ 25, but evidence at the hearing plainly established that ***this representation was not truthful***.
>
> Why this situation has come to pass is a mystery. From the start of this case, Google has had every opportunity to flag the handling of Chat and air concerns about potential burden, costs, and related factors. At the very least, Google should have advised plaintiffs about its preservation approach early in the litigation, and

engaged in a discussion with them. It chose to stay silent until compelled to speak by the filing of the Rule 37 motion and the Court's intervention. The Court has repeatedly asked Google why it never mentioned Chat until the issue became a substantial problem. It has not provided an explanation, which is worrisome, especially in light of its unlimited access to accomplished legal counsel, and its long experience with the duty of evidence preservation.

***Another major concern is the intentionality manifested at every level within Google to hide the ball with respect to Chat***. As discussed, individual users were conscious of litigation risks and valued the "off the record" functionality of Chat. Google as an enterprise had the capacity of preserving all Chat communications systemwide once litigation had commenced but elected not do so, without any assessment of financial costs or other factors that might help to justify that decision.

This is in sharp contrast to Google's handling of email. When a litigation hold is in place, Google automatically preserves all emails from relevant custodians without requiring any individual action. Custodians cannot override the automated preservation of their emails. See Hrg. Tr. at 54:12-55:1. Google took the opposite course with Chat, and ***gave each employee carte blanche to make his or her own call about what might be relevant in this complex antitrust case, and whether a Chat communication should be preserved***. The obvious danger of this approach was captured in Rosenberg's testimony about not really knowing the issues in this litigation, and not preserving his communications. Google aggravated the situation by intentionally deciding not to check up on employee decisions to ensure that relevant evidence was being preserved. In effect, Google adopted a "don't ask, don't tell" policy for Chat preservation, at the expense of its preservation duties.

Consequently, on the record as a whole, ***the Court concludes that Google did not take reasonable steps to preserve electronically stored information that should have been preserved in the anticipation or conduct of litigation***. Fed. R. Civ. P. 37(e). The record demonstrates that the deleted Chat evidence "cannot be restored or replaced through additional discovery." Id. ***The record also establishes intentionality*** for purposes of Rule 37(e)(2). The Court concludes that Google intended to subvert the discovery process, and that Chat evidence was "lost with the intent to prevent its use in litigation" and "with the intent to deprive another party of the information's use in the litigation." Comm. Notes, Subdivision (e)(2).

A prejudice finding under Rule 37(e)(1) is not strictly necessary because the finding of intent under subdivision (e)(2) supports "not only an inference that the lost information was unfavorable to the party that intentionally destroyed it, but also an inference that the opposing party was prejudiced by the loss of information that would have favored its position." Comm. Notes, Subdivision (e)(2). ***It is clear in the record that relevant, substantive business communications were made on Chat that plaintiffs will never see, to the potential detriment of their case***. Google says that the prejudice is limited because there are only "21 custodians for which the parties agreed to conduct limited post-Complaint discovery," and "[f]or only 21 of the total 44 custodians, the parties agreed that Google would search for

documents dated after August 13, 2020. With respect to the remaining 23 custodians, the cut-off date was on or before August 13, 2020." Dkt. No. 429 at 5-6 (emphasis in original; internal citation omitted). The point is not well taken. The agreements between the parties were made while plaintiffs were completely in the dark about Google's Chat practices, and the Court declines to give Google any benefit from deals made on incomplete information. In addition, prejudice for Rule 37 purposes is a matter of fairness and equity, which is why Rule 37(e) "leaves judges with discretion to determine how best to assess prejudice in particular cases." Comm. Notes, Subdivision (e)(1). It is also not plaintiffs' burden to prove prejudice, see id., but the plaintiffs' supplemental briefs and evidence, Dkt. No. 468, certainly did so….

> **The Court fully appreciates plaintiffs' dilemma of trying to prove the contents of what Google has deleted.**

127.    On December 6, 2023, Judge Donato conducted a hearing in N.D. of California case 3:20-cv-05671-JD, Dkt. 591, attached as Exhibit C.  At that hearing Judge Donato held, on the issue of spoliation:

> **it is deeply troubling to me** as a judicial officer of the United States, the record that I have seen by Google in this case with respect to the **willful and intentionally suppression of relevant evidence**.

> You-all recall that I concluded after a prior evidentiary hearing with testimony from -- and other evidence from Google and its employees, that **Google had failed to preserve Chat evidence with the intent of preventing its use in this litigation and with the intent of depriving Epic of the use of that evidence**. That's at Docket Number 469 [sic 401], page 18.

> The evidence presented during trial most recently in the testimony of Google employee Loew, L-O-E-W, just an hour or two ago has strongly underscored this conclusion. Google's witnesses at trial have testified about making **intentional decisions not to preserve Chats with potentially relevant evidence**.

128.    At the same December 6, 2023 hearing, Judge Donato stated, on the issue of privilege:

> Google's witnesses have also -- and I'm referring here namely to in-house attorney Emily Garber – have also testified or given **disturbing testimony about the use of,**

> **quote, "fake privilege," close quote**, claims with respect to internal Google documents and communications. As I said previously, I found Attorney Garber's effort to explain this away to be not credible and unpersuasive.

I have also noticed an unusually large number of documents, Google documents, labeled "Privileged and Confidential" by Google employees who prepared them. These documents, which I have looked at quite closely in the course of their presentation in evidence, these documents *on their face have typically not included any indicia that the document was, in fact, prepared in connection with an attorney-client communication or with the goal of it soliciting attorney advice*.

You will recall that I asked, I think it was yesterday -- was that Paul Gennai? -- yesterday I asked Google witness Paul Gennai about this very point. You will recall that he had labeled as privileged and confidential a document that he, himself, described as his own personal notes. This document lacked any indication that it was privileged in any way. And in response to my questions about his assertion of the privilege, *he did not establish any basis whatsoever for a valid claim that these are privileged and confidential notes*.

129.    At the same hearing, Judge Donato further stated:

Now, the result of all this, I invited Google's chief legal officer, Kent Walker, to come in and help me understand why all of this was happening and *why these evidence games were so rampant at Google*. I found his testimony, which was taken outside the presence of the jury, did not do anything to assuage my concerns. *The testimony of Attorney Walker was evasive and was materially inconsistent* with testimony given by Google's witnesses at the Chat hearing as described in Docket 469.

All of this presents *the most serious and disturbing evidence I have ever seen in my decade on the bench* with respect to a party intentionally suppressing potentially relevant evidence in litigation. *I have just never seen anything this egregious*. And my concern, as every judge's concern would be, is motivated by the fact that this conduct is *a frontal assault on the fair administration of justice. It undercuts due process and it calls into question the just resolution of legal disputes*. It's antithetical to our system.

It also imposes tremendous taxes and costs, in terms of time and effort money, on opposing parties. Just getting through *bogus privilege assertions* alone takes forever. Somebody has to look at those documents, they have to evaluate it, they have to make a claim, they have to fight about it, and then they have to come to the judge to get it resolved.

In addition to that, it imposes completely untenable costs on scarce federal judicial resources having to deal with all of this. There is nothing I would rather do than not deal with this, but you have forced me to do it because of this *rampant and systemic culture of evidence suppression at Google*.

Now, that's a long line of me saying I'm not going to give a mandatory instruction, and I'm going to tell you why. *There is no doubt in my mind a mandatory inference would be amply warranted in this case given all the evidence we have*.

27

However, I have concluded that the best course of action is for the jury itself to decide whether it will make an inference, and I am not going to constrain the jury's discretion by making that inference for them or making that decision for them. I believe that is most faithful to the right to a jury trial, the Seventh Amendment, and also the fair administration of justice. So even though ***it would be well within bounds to issue a mandatory inference instruction***, I'm going to decline to do that and take the more conservative approach of letting the jury decide for itself.

**Judge Mehta's Findings and Rulings on August 5, 2024**

130.    On August 5, 2024, this Court issued the Memorandum Opinion attached as

Exhibit A in D. D.C. Case 1:20-cv-03010-APM, Dkt. 1033, with respect to spoliation:

When Plaintiffs speak of "systemic destruction of documents" they mean Google's longtime practice (since 2008) of deleting chat messages among Google employees after 24 hours, unless the default setting is turned to "history on," which preserves the chat. Id. at 76–78. This failure to retain chats continued even after Google received the document hold notice at the start of the investigative phase of this case. It was not until Plaintiffs moved for sanctions in February 2023, more than two years after filing suit, that Google changed its policy to automatically save all chats of employees under a legal hold. Plaintiffs maintain that, as a result of Google's chat deletion policy, "years' worth of chats—likely full of relevant information—were destroyed" and thus never subject to regulatory scrutiny, "show[ing] that Google knew its practices were likely in violation of the antitrust laws and wanted to make proving that impossible." Id. at 78. Plaintiffs demand sanctions under Rule 37(e) for Google's failure to preserve chats after it received the litigation hold notice.

131.    This Court's August 5, 2024 Opinion also held, with respect to privilege:

As for "flagrant misuse of the attorney-client privilege," that refers to Google's "Communicate with Care" initiative. Google trained its employees to add its in-house lawyers on "any written communication regarding Rev Share [RSA] and MADA." Id. at 78 (quoting UPX320 at 605). It also instructed that, when "dealing with a sensitive issue" via email, to "ensure the email communication is privileged" employees could add a "lawyer in [the] 'to' field," "mark 'Attorney/Client Privileged,'" and "ask the lawyer a question." Pls.' Mot. to Sanction Google & Compel Disclosure of Docs. Unjustifiably Claimed by Google as Att'y-Client Privileged, ECF No. 317, Ex. 1, ECF No. 317-4, at 363. Google employees assiduously followed that advice. UPTB at 78–79 (collecting examples). ***As a result, Google's outside counsel in this case initially withheld tens of thousands records on the grounds of privilege, which ultimately were re-reviewed, deemed not privileged, and produced to Plaintiffs***. See Jt. Status Report, ECF No. 361, at 20–23. This creation of faux privileged materials, Plaintiffs contend, "demonstrates that Google intended to harm competition through its contracting practices and its supposed procompetitive justifications were simply pretext." UPTB at 79….. On

the request for sanctions, the court declines to impose them. Not because Google's failure to preserve chat messages might not warrant them.

132.    Judge Mehta's Opinion further stated: "Still, the court is taken aback by the lengths to which Google goes to avoid creating a paper trail for regulators and litigants." Ex. A at 275.

133.    While declining to enter sanctions against Google, Judge Mehta's Opinion further stated:

> The court's decision not to sanction Google should not be understood as condoning Google's failure to preserve chat evidence. Any company that puts the onus on its employees to identify and preserve relevant evidence does so at its own peril. Google avoided sanctions in this case. It may not be so lucky in the next one.

**Judge Brinkema's Findings and Rulings on August 27, 2024**

134.    On August 27, 2024, Judge Leonie M. Brinkema conducted a hearing in E.D. of Virginia case no 1:23-cv-00108-LMB-JFA Dkt. 1279, transcript attached as Exhibit E.  Among other things, at that hearing Judge Brinkema stated, on the issue of spoliation:

> ***There are a whole bunch of problems with how Google approached the preservation of evidence in this case***. I mean, the Walker memo of course goes back to before litigation was actually started, but ***there's incredible smoking guns within that document***. I mean, there's ***a clear recognition***, you know, "as you know, Google continues to be in the midst of several significant legal and regulatory matters, including government review of our deal with Yahoo." And then it goes on. And then – you know, so it sets the setting for an argument that ***there was definitely a very clever approach to try to hide relevant information going back to 2008***.
>
> And then ***my concern from the record of this case*** -- and I'm looking at Appendix B that was attached to the government's motion -- which talks about the litigation hold and the incredible delay in which various witnesses were notified about that litigation hold. Because that has a huge impact, ***given the fact that there was this automatic deletion as to chat messages that just indicates that an awful lot of evidence has likely been destroyed***. You need to address those issues.

135.    Judge Brinkema further stated:

I do not understand, frankly, why the history-on/history-off default concept was not

changed as soon as Google realized that it was going to be truly under the gun. I mean, I understand why they did it, but it was a foolish decision. I think that should have been changed quickly. And that would have avoided this whole problem, frankly, that we have now, because then the government could see with a particular chat, oh, this one, the delete was put on. And if the default was it's always historically preserved, but in this particular case somebody deleted it, then you could focus on why was that deleted. *You've lost that ability in this case because everything is deleted unless it's saved.*

136.    On the issue of using privilege as a "smoke screen," Judge Brinkema held:

I certainly do not mind saying right now from the bench that the policy – the Communicate-with-Care policy, in my mind, is not the way in which a responsible corporate entity should function. Slapping on the -- you know, attorney on email -- in many cases routine email messages just to be able to throw up a smoke screen of, you know, attorney-client privilege is, in my view, a clear abuse of the privilege….. think it clearly -- this approach, putting the attorney communication business on almost all communications that are at all sensitive is absolutely inappropriate and improper, and I would draw inferences from that.

## X.    ADDITIONAL SPECIFIC ALLEGATIONS RELATING TO ANTITRUST STANDING

137.    In response to the complaint filed on October 1,  2024 (Dkt. No. 1), Google filed a motion to dismiss alleging that Sensory lacks standing to complain of Google's anticompetitive behavior. Dkt. No. 12.  To the extent any of the issues raised in the motion to dismiss were not already addressed above, Sensory adds these additional allegations.

138.    As explained above, the Sensory products that were directly affected by Google's anticompetitive behavior are Sensory's TrulyHandsfree Product, Sensory's TrulyNatural Product and Sensory's TrulySecure Product.

139.    One market in which Google engage in anticompetitive conduct that directly injured Sensory is the market for wake word technology on smartphones and tablets running the Google Android operating system.

140.    Sensory suffered injuries from Google's anticompetitive conduct in the market for wake word technologies on smartphones and tablets running the Google Android operating

system at least to the extent Google's MASA and RSA agreements resulted in eliminating Sensory as a competitor with Google from that market.

141.    One market in which Google engage in anticompetitive conduct that directly injured Sensory is the market for voice assistant technology on smartphones and tablets running the Google Android operating system.

142.    Sensory suffered injuries from Google's anticompetitive conduct in the market for voice assistant technologies on smartphones and tablets running the Google Android operating system at least to the extent Google's MASA and RSA agreements resulted in eliminating Sensory as a competitor with Google from that market.

143.    Google is an adjudicated monopolist in the market for general search services.

144.    Google is a monopolist in the market for voice searching.

145.    Google is a monopolist in the market for access points to general search services.

146.    Google is a monopolist in the market for wake words on smartphones and tablets running the Android operating system supplied by Google.

147.    Google is a monopolist in the market for voice assistants on smartphones and tablets running the Android operating system supplied by Google.

148.    Google is a monopolist in the market for voice recognition software (speech to text) used for search on smartphones and tablets running Google's Android operating system.

149.    There are no alternatives or substitutes available to Android handset manufacturers (or consumers that use Android phones) for wake words, voice assistants, voice searching, access points to general search services, voice recognition software (speech to text) other than what Google provides and requires because of Google's anticompetitive conduct.

150.    Given its exclusionary contracts, including its MADA and RSA agreements with

device manufacturers, Google has monopolized the market for each of the markets identified above.

151.    A purpose of Google's exclusionary contracts is to protect and extend Google's monopoly in search, including in voice searching and general searching.

152.    Sensory was a participant (and a competitor of Google) in the market for wake words on smartphones and tablets running the Android operating system supplied by Google.

153.    Sensory was a participant (and a competitor of Google) in the market for access points to general search services on phones and tablets running the Android operating system supplied by Google.

154.    Sensory was a participant (and a competitor of Google) in the market for voice assistants on smartphones and tablets running the Android operating system supplied by Google.

155.    Sensory was a participant (and a competitor of Google) in the market for voice recognition software (speech to text) used for search on smartphones and tablets running the Android operating system supplied by Google.

156.    Google's exclusionary contracts, including its MADA and RSA agreements with device manufacturers, require the use of Google's wake words and the Google Voice Assistant (including the voice recognition software (speech to text) used for search) and prohibit or restrict the use of competing wake words and voice recognition software used for search.

157.    One purpose of Google's exclusionary contracts, including its MADA and RSA agreements with device manufacturers that require the use of Google wake words and the Google Voice Assistant (including the voice recognition software (speech to text) used for search) was to protect and expand Google's monopoly in the general search market and the voice search market.

158.    As a result of Google's exclusionary contracts, including its MADA and RSA

32

agreements with device manufacturers, Google eliminated its competitor, Sensory, from all of these markets.

159.    As a result of Google's exclusionary contracts, including its MADA and RSA agreements with device manufacturers, which were designed to expand and protect its monopoly in the general search market, Google caused antitrust injury to Sensory.

160.    But for Google's anticompetitive actions, increased or ongoing use of Sensory's technology would enable consumers to more easily access search engines other than Google's. When Google does not completely control the wake word or the voice recognition software, Google cannot control and mandate that the search be sent only to Google.

161.    As set forth in detail above, a meaningful and increasing percentage of search queries come through voice and are originated by wake words, voice recognition software, voice searching, and related access points such that redirecting voice search traffic to, say, Bing would have increased competition in general search and voice search.

162.    As explained in detail above, causing harm and injury to Sensory by pushing it out of the markets is an indispensable and intertwined part of Google's scheme to maintain dominance in, and control over, each of these markets; getting Sensory and its technology out of these markets was the means by which Google got could keep search rivals out of the markets, including for general text search and voice-based search.

163.    Google's anticompetitive conduct in the markets discussed above was an effort to protect or extend Google's monopoly in general search by controlling access points to general search engines, and Sensory suffered antitrust injury as a result of Google's anticompetitive conduct.

33

## XI.    DAMAGES TO SENSORY

164.    Google's anticompetitive actions caused concrete injury to Sensory in the forms of at least lost revenues and lost customers, including, for example, when Sensory lost business with Samsung because of Google's anticompetitive conduct.

165.    Google's actions prevented Sensory from selling wake word technology to any Android phone or tablet manufacturer running Google's Android mobile operating system, such that Sensory cannot compete with Google in the market for wake word technology for Android phones or tablets.

166.    Google's actions prevented Sensory from selling voice assistant technology to any Android phone or tablet manufacturer running Google's Android mobile operating system, such that Sensory cannot compete with Google in the market for voice assistant technology for Android phones or tablets..

167.    Google's actions have prevented Sensory from selling voice recognition software (speech to text) to any smartphone or tablet manufacturer running Google's Android mobile operating system, such that Sensory cannot compete with Google in the market for voice recognition software (speech to text) for Android phones or tablets.

168.    Google's actions prevented Sensory from selling any of its technologies into the market for access points to general search services and voice searching, e.g. to Android phone or tablet manufacturers, such that Sensory cannot compete with Google in the market the market for access points to general search services and voice searching for Android phones or tablets.

169.    Additionally, as a result of Sensory's technical and business success with wake words, voice recognition software, and related technologies, Sensory had a foothold on the devices and the ability to sell add-on features to customers. The ability to offer additional

services, and generate revenue from sales of these additional services, was important to

Sensory's long-term growth and expansion. The more solutions Sensory could provide to a

particular customer, the less likely that customer would try or be able to replace Sensory's suite

of solutions or a portion of them.  Known as "stickiness," the more a customer would commit to

Sensory's solutions, the more difficult it would be to remove Sensory technologies.

170.    By removing Sensory's foothold, Google's actions hurt Sensory's ability to offer

and sell other solutions, such as command and control, sound ID, and other technologies.

### COUNT I:  GOOGLE'S VIOLATIONS OF 15 U.S.C. § 2.

171.    Sensory incorporates by reference the allegations set forth in all of the preceding

paragraphs of this Complaint as though set forth again in full.

172.    As detailed above and in the public record, Google has a long and growing history

anticompetitive conduct that has required the intervention of multiple regulatory bodies and

courts around the world to control.  For example, as reported in *The Washington Post*, the

"European Union spent a decade pursuing Google on antitrust charges, ultimately fining the

company $10 billion for using illegal tactics to abuse its dominant position on the market."

Jeanne Whalen, *Europe Fined Google Nearly $10 Billion for Antitrust Violations, but Little Has

Changed*, Wash. Post (Nov. 10, 2020).[6] .  The $10 billion fine was in addition to a separate fine

of $2.8 billion imposed by the EU in 2017:  "After a separate probe, the E.U. in 2017 fined

Google $2.8 billion, concluding it had 'abused its market dominance' to give an 'illegal

advantage' in its search results to Google Shopping, the horizontal bar of product ads Google

features at the top of the search results screen." *Id*.

173.    The European investigations have been followed by investigations and lawsuits in

---

[6] https://www.washingtonpost.com/technology/2020/11/10/eu-antitrust-probe-google/.

the United States, many of which have focused on Google's violations of section 2 of the Sherman Act.

174.    Violation of Sherman Act § 2 has two elements: (1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power, as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.

175.    As explained below, Google possesses monopoly power in several markets, and has acquired and maintained that power through a series of anticompetitive conduct.

## I.    Google's Monopoly Power

### A.    Google Has Monopoly Power in the General Search Services Market

176.    General search engines enable consumers to search the vast contents of the internet. Google possesses monopoly power in the market for general search services.

177.    Twenty years ago, Google already claimed to be the world's largest general search engine. Its market share in general search services has grown since, from 70 percent in 2007, to over 90 percent in 2019. *See, e.g.*, *10 Google Search Statistics*, Oberlo (Jan. 2, 2022) (reporting that Google had 92.18% of market share in July 2019).[7] No competing search engine has more than 7 percent of the market, and, over the past decade, no new entrant in the general search market in the United States has accounted for more than 1 percent of internet searches in a given year.

178.    Google's monopoly in general search has led to monopolization of the general search advertising market. The revenue Google generates from its dominance of general search advertising is astounding. Within the last decade, Google's revenue from search advertising has

---

[7] https://www.oberlo.com/blog/google-search-statistics.

grown 300 percent and accounts for 61 percent of Google's total revenue. In 2019, Google made more revenue in what it characterizes as search advertising—$98 billion—than the GDP of 12 countries and the budgets of 46 States.

179.    Google effectively owns or controls search distribution channels accounting for roughly 80 percent of the general search queries in the United States. In recent years Google search has conducted nearly 90 percent of all general-search-engine queries in the United States.

180.    The Court's Memorandum Order already held:

> After having carefully considered and weighed the witness testimony and evidence, the court reaches the following conclusion: ***Google is a monopolist, and it has acted as one to maintain its monopoly. It has violated Section 2 of the Sherman Act.***
>
> Specifically, the court holds that (1) there are relevant product markets for ***general search services*** and general search text ads; (2) ***Google has monopoly power in those markets***; (3) ***Google's distribution agreements are exclusive and have anticompetitive effects; and*** (4) Google has not offered valid procompetitive justifications for those agreements. Importantly, the court also finds that Google has exercised its monopoly power by charging supracompetitive prices for general search text ads. That conduct has allowed Google to earn monopoly profits.

Ex. A at 4 (emphasis added).

## B.  Google Has Monopoly Power in the Markets for Wake Word, Voice Assistant, and Voice Recognition Software (Speech To Text) Used For Search on Android Phones

181.    Wake words are commonly used to access voice-based "assistants," which are used to conduct internet searches and return information to the user.

182.    Each voice assistant typically has its own wake word.

183.    Consumers should be allowed to choose which voice assistant they use.

184.    Consumers should be allowed to choose which search engine they use.

185.    Voice-based search has become a popular way to conduct internet searches, and the popularity of voice-based search is increasing.

186.    For example, in May 2016 Google reported that 20-25 percent of mobile queries are voice-based searches. *See, e.g.,* Greg Sterling, *Google Says 20 Percent of Mobile Queries Are Voice Searches*, Search Engine Land (May 18, 2016).[8]

187.    According to Google's Mobile Voice Study, 55% of teens use voice search on Google every day. Meg Prater, *25 Google Search Statistics to Bookmark ASAP*, HubSpot (June 9, 2021).[9]

188.    According to a November 2024 study, https://www.demandsage.com/voice-search-statistics/ :

- About 20.5% of people worldwide use voice search.

- Around 8.4 billion voice assistants are expected to be in use globally.

- In the United States, 149.8 million people are anticipated to use voice assistants.

- Approximately 27% of people use voice search on their mobile devices.

189.    At trial, Google's witness Prabhakar Raghavan, Senior Vice President, Knowledge and Information Products, testified, for example: "I expect that in time, for instance, you will see these language models be able to service queries not only from typewritten prompts, ***but voice queries***, image, camera, as well. And that's a journey that we're still early on."  Exhibit A pp. 40-41.  See also Exhibit A ¶¶59, 114, 295, 366.

190.    If free from Google's anticompetitive conduct, voice-based searches present avenues for competition to Google's dominance in search.

191.    For example, if consumers were to begin relying on voice search not controlled by Google, those devices could support and enable competition in the search-related markets by

---

[8] https://searchengineland.com/google-reveals-20-percent-queries-voice-queries-249917.

[9] https://blog.hubspot.com/marketing/google-search-statistics.

mixing and matching different (and non-Google) search engines for different purposes.

192.    To prevent the erosion or loss of its monopoly in search, Google has constructed a series of artificial barriers to protect against the use of voice assistants to access non-Google search engines.

193.    Google's actions have been directed to preventing consumers from using wake words on smartphones and tablets running the Android operating system supplied by Google that interact with search engines, or voice recognition software (speech to text) used for search, that are outside of Google's control.

194.    Google's actions have been directed to precluding consumers from using wake word software that allows the use of concurrent wake words to access different voice assistants and different search engines outside of Google's control.

195.    For a wake word to function with Google's voice assistant it requires Google's permission; similarly, software that allows concurrent wake words cannot function without Google's permission.

196.    Starting around 2011, consumers began migrating some uses from personal desktop computers to mobile devices (*e.g.*, smartphones). By 2017, most general search queries in the United States were made on mobile devices, not desktop browsers. Mobile devices offered new search access points.

197.    Search services can be delivered to mobile-device users through a variety of search access points, including voice assistants accessed by a button or voice command and designed to answer voice-initiated queries.

198.    Phones or tablets typically have search access points preset with a search engine as the default. These preset defaults are usually governed by a distribution and/or licensing

agreement.

199.    Google search has preset default status for an overwhelming share of the search access points on mobile devices sold in the United States, especially including mobile devices that run Android OS.

200.    Android OS is described as an "open source" platform developed and sponsored primarily by Google, but Google has proprietary versions of Android OS that enable mobile phones to access certain Google features and services (*e.g.,* Google Play Store, Google Maps, etc.).  Android OS is currently on over 70 percent of mobile devices and almost all of them run Google's proprietary versions. Google has used its power through Android OS to require that mobile phone manufacturers implement Google's general search engine as the default option on all major search access points, such as the browser or search widgets on the mobile device.

201.    In addition, all Google licensed Android phones come with Google Assistant built-in and set as the default voice assistant. Google requires that its wake word technology be used to call Google Assistant.

202.    When a device uses Google Assistant, the consumer is already within Google's realm of control.  The Google Assistant uses Google for search.  Google has set restrictive policies on voice assistants and wake words to access the Google proprietary Android OS. Google has foreclosed or limited Sensory's opportunity to provide its wake word products, including its concurrent wake word product, which would allow competitive voice assistants to operate on mobile phones running Google's Android OS, where the Google Assistant would be listening concurrently with another assistant.

203.    Some of Google's anti-competitive conduct relates to its distribution of Google Assistant. Google limits competition to its Google Assistant on Android devices.  On

information and belief, Google has put into place a series of artificially-restrictive contracts that have guaranteed it *de facto* exclusivity in the vast majority of Android mobile channels, thus limiting the ability of consumers to reach general search competitors through other voice assistants, i.e. disallowing concurrently.

204.    On information and belief, Google also imposes contractual exclusivity on voice assistants, for example, by barring the hardware manufacturers of voice assistant devices from permitting consumers to move easily between Google Assistant and competing voice assistants, which serve as distribution channels for competing search services. As pled in the Colorado Complaint ¶ 48, Google has even precluded the inclusion of rival personal assistant devices in any sales—even as a free addition—by a partner subject to its incentive program.

205.    On information and belief, Google's Mobile Application Distribution Agreement ("MADA") contracts began requiring mobile phone manufacturers to use Google Assistant.

206.    On information and belief, Google also modified its revenue share agreements to provide for exclusivity for Google Assistant across mobile devices. The practical effect of these agreements is to require mobile manufacturers and mobile carriers doing business with Google to shut out potential competitors to Google Assistant.

207.    In instances where Google does not own the consumer-facing voice assistant (*i.e.,* it is not Google Assistant), Google has contracted to ensure that the consumer-facing voice assistant also relies upon Google's general search services for general queries. For instance, both Apple's Siri and Samsung's Bixby use Google's search services to search the internet.

208.    Google also requires that Google Assistant and Bixby or other voice assistants cannot simultaneously function. Sensory was not only restricted in deploying a Google wake word but could not deploy its multi-wake word technology with the Google Assistant.  Google's

requirements make other voice assistants so cumbersome to use that they are effectively blocked. For example, on some Samsung phones Bixby is called by a button press and is therefore not hands-free (https://www.samsung.com/global/galaxy/what-is/bixby-button/).  Bixby invokes Google's voice assistant and search. Google has prevented simultaneous usage or simultaneous wake words.

209.    Google has entered partnerships with manufacturers of mobile devices.  On information and belief, Google has required these agreements with these manufacturers to effectively exclude wake words outside its control (including Sensory's products and services) from a range of devices. In addition, Google has prevented multiple assistants from running concurrently on any device and from running at all on some devices, which also precludes the use of custom voice assistants.

210.    To protect and entrench its dominant position in search, Google has also imposed requirements that exclude Sensory's concurrent wake words from a range of devices capable of running voice assistant technology.

211.    As a result of its anticompetitive conduct, on information and belief, Google has monopoly power in the market for access points to general search services and voice searching on Android phones and tablets.

## II.    Google's Maintenance and Extension of Its Monopoly Power in These Markets

212.    Google has obtained, maintained and extended its monopolies in these markets through its agreements with Android device manufacturers as described throughout this document, including in the Google documents discussing its contractual requirements, as discussed throughout this Complaint.

213.    Search access points are the places at which a consumer may enter a general

search query.  At the search access point, consumers should be allowed to choose whether they use Google or another search engine for a search.

214.    In text-based searching, some search access points are the toolbar and/or URL of a web browser on a laptop or a mobile phone.  In voice-controlled search, the wake word is the gateway to opening the search browser and, importantly, choosing which search engine to use.

215.    Google has used several mechanisms to protect and extend its dominance in general search, including: (1) securing default positions on search access points; and (2) securing exclusivity across search access points.

216.    For a search engine, the most effective means of distribution is to be the preset default general search engine for mobile and computer search access points. Even where users can change the default, they rarely do. This leaves the preset default general search engine with *de facto* exclusivity. The defaults are sticky.

217.    Google's anticompetitive conduct involves foreclosing access to search access points through contracts that require device manufacturers and others to exclude providers of technology outside of Google's control from search access points. In the case of voice-based search, Google's anticompetitive conduct includes excluding independent providers of wake words and voice recognition like Sensory and excluding other voice assistants.

218.    On information and belief, Google has maintained an official practice for at least the last six years to hide evidence of its antitrust violations from regulators and private companies. Around 2015, Google instituted a "Communicate with Care" policy to label internal documents and communications as attorney-client privileged in an attempt to shield ordinary business communications related to its anticompetitive conduct from discovery. *See* Dkt. 326-1, Memorandum in Support of Plaintiff's Motion to Sanction Google and Compel Disclosure of

Documents Unjustifiably Claimed by Google as Attorney-Client Privileged, *United States v. Google LLC*, No. 1:20-cv-03010-APM (D.D.C. Mar. 21, 2022). Google documented its "Communicate with Care" practice in training slides that instruct personnel emailing about ordinary business to copy Google's in-house counsel and to include a generic statement such as "[attorney,] please advise" on. Evidence that such 'requests' for legal advice are pretextual include: "Communicate with Care" training slides instructing Google personnel to "*any* written communication regarding Rev[enue] Share and MADA [i.e., Mobile Application Distribution Agreement] should include Legal"; tens of thousands of emails where the attorney never responds and the email chain eventually drops the attorney; and emails where non-legal Google personnel discuss a business issue, subsequently "add[] legal to make this privileged due to the sensitive nature of the data," but the attorney never responds. Google's Communicate with Care practice harmed federal and state regulators, among others, in their lawful attempts to understand Google's anticompetitive conduct and to conduct depositions of Google's witnesses.

### COUNT II: SHERMAN ACT § 1 - ILLEGAL TYING OF ANDROID OS, GOOGLE CLOUD, GOOGLE PLAY STORE AND OTHER GOOGLE PRODUCTS AND SERVICES TO GOOGLE ASSISTANT AND OTHER RESTRICTIONS

219.    Sensory incorporates and restates the allegations in paragraphs 1 through 218 above.  Google's contracts and agreements with others, including hardware manufacturers, tie the availability of Android OS, the Google Cloud, and revenue sharing to the use of the Google Assistant, the exclusion of or limitations on customer voice assistants, the exclusion of concurrent wake words, and other limitations.

220.    The tying and tied goods are two separate products in distinct product markets. Through coercion, Google tied distribution of Android, Google Cloud, its Google search services, including its mobile applications (e.g. Google Phone-top Search and the Android Market Client and Chrome Browser) and its the Google Play store (the tying goods and services)

to Google's requirement that the handsets must also use Google's hotword/wake words and Google's Google Assistant, and to Google's requirements that these phones and devices must not include other hotword/wake words or voice assistants, voice recognition software, and voice search access points (the tied goods) if the handset manufacturers wanted to keep the Google tying goods and services.

221.    Google has market power in the tying product markets and in most cases sole control over these markets.  For example, Android handset manufacturers cannot install or use Google Android and Google's apps (e.g. Google Play Store, Google Cloud) on their handsets without Google's permission and agreement.  Android handset manufacturers need license agreements from Google, e.g. the MADA and RSA agreements discussed above.

222.    Android handset manufacturers have no alternatives to entering agreements with Google because there are no substitutes available for Android handsets for the Google Android operating system, the Google Play store, or Google search.

223.    Google affords consumers (and the handset manufacturers) no choice, and indeed blocks choice, but to purchase and use the tied products Google's wakewords and Google's Google Assistant, Google's voice recognition software, and Google's voice search access points.

224.    Google's tying arrangement "forecloses a substantial volume of commerce" including Sensory's sales of wakewords, voice assistants, voice recognition software, and voice search access points as well as consumer choice of search engine.

225.    Sensory was a participant (and a competitor of Google) in the market for wake words on smartphones and tablets running the Android operating system supplied by Google.

226.    Sensory was a participant (and a competitor of Google) in the market for access points to general search services on phones and tablets running the Android operating system

supplied by Google.

227.    Sensory was a participant (and a competitor of Google) in the market for voice assistants software on smartphones and tablets running the Android operating system supplied by Google.

228.    Sensory was a participant (and a competitor of Google) in the market for voice recognition software (speech to text) used for search on smartphones and tablets running the Android operating system supplied by Google.

229.    Google has willfully and wrongfully acquired, maintained, and extended its monopoly power in general search, voice search, wakewords, voice recognition software and voice search access points through anticompetitive and exclusionary behavior.

230.    The foregoing acts and practices, and the continuing course of Google's anticompetitive conduct, have harmed consumers and competition.

231.    Google's anticompetitive and exclusionary conduct has directly and proximately caused injury to Sensory's business and property, as set forth above.

### COUNT III: VIOLATIONS OF DISTRICT OF COLUMBIA CODE §§ 28-4502, 4503, AND 4508

232.    Sensory incorporates and restates the allegations in paragraphs 1 through 231 above.

233.    Google's conduct as alleged in this Complaint also violates District of Columbia Code §§ 28-4502 and 28-4503.

234.    District of Columbia Code § 28–4502 provides that contract, combination conspiracies in restraint of trade or commerce all are illegal.

235.    District of Columbia Code § 28–4502 provides that it is unlawful to monopolize or attempt to monopolize any part of trade or commerce.

236.    District of Columbia Code § 28–4508 allows for injunctive and compensatory relief for private parties.

237.    The foregoing acts and practices, and the continuing course of Google's anticompetitive conduct, have harmed consumers and competition.

238.    Google's anticompetitive and exclusionary conduct has directly and proximately caused injury to Sensory's business and property, as set forth above.

## REQUEST FOR RELIEF

Plaintiff respectfully requests that the Court, as authorized by statute and its own equitable powers, enter final judgment against Google and:

a. Adjudge and decree that Google acted unlawfully to maintain monopolies in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and District of Columbia Code §§ 28-4502, 4503, and 4508, in any the markets;

b. Enter any relief, as needed, to cure any anticompetitive harm from Google's conduct, prevent any future harm, and undo the continuing effects of past harm to competition, including those harms detailed herein;

c. Preliminarily and permanently enjoin Google from continuing to engage in the anticompetitive practices alleged herein and in similar and related conduct in the future

d. Grant such other equitable relief as the Court finds necessary to redress and prevent recurrence of Google's violations of the laws specified more fully above.

Dated: January 17, 2024

Respectfully submitted,

By: */s/ Alison Aubry Richards*

Alison Aubry Richards (Bar ID IL0109)
David P. Berten (Bar ID IL0107)
Global IP Law Group, LLC
55 W. Monroe St., Ste. 3400
Chicago, Illinois 60603
Phone:  312.241.1500
arichards@giplg.com
dberten@giplg.com

*Attorneys for Plaintiff Sensory Inc.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that this document was served by email to all counsel of record on

January 28, 2025:

John E. Schmidtlein
(D.C. Bar No. 441261)
Benjamin M. Greenblum
(D.C. Bar No. 979786)
680 Maine Avenue, S.W. Washington, DC 20024
 jschmidtlein@wc.com
bgreenblum@wc.com

*/s/ Alison Aubry Richards*
Alison Aubry Richards
